

FILED
2022 Oct-14  AM 08:27
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| **LAVENTRA DENICE RUTLEDGE, AS ADMINISTRATRIX OF THE ESTATE OF THOMAS LEE RUTLEDGE,** ) ) ) ) ) | |
| **Plaintiff,** ) | |
| ) | **CIVIL ACTION NUMBER:** |
| ) | **2:21-CV-226-RDP** |
| **v.** ) | |
| ) | |
| **CHRISTIE SANSING AND CORY ELLER, LIEUTENANT TIM POPE, WARDEN PHYLLIS MORGAN, WARDEN KENNETH PETERS, AND CORRECTIONS OFFICERS J. RODGERS, C. DEAN, AND G. GRIFFIN, PLANT MAINTENANCE SUPERVISOR III BILLY KENNEDY, P & M MECHANICAL, INC., TAYLOR ELECTRICAL CONTRACTORS, INC., LS&R LLC, AUTOMATED LOGIC CORPORATION, ADCO COMPANIES, LTD., SOUTHEASTERN TEMPERATURE CONTROLS INC., d/b/a STC WORLDWIDE, AND FICTITIOUS DEFENDANTS,** ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| **Defendants.** | |

**FICTITIOUS DEFENDANTS A, B and C**, whether singular or plural, that person, firm, corporation, or entity, of which was engaged in construction activities, renovation, design, repair, replacement, installation, removal, demolishment of the

HVAC system and/or the like, at the William E. Donaldson Correctional Facility in Bessemer, Alabama from 2019 to December 7, 2020;

**FICTITIOUS DEFENDANTS D, E and F**, whether singular or plural, that person, firm, corporation, or entity, responsible for designing, renovating maintaining, inspecting, repairing, replacing, installing, removing, demolishing or equipping the HVAC system at the William E. Donaldson Correctional Facility in Bessemer, Alabama from 2019 to December 7, 2020;

**FICTITIOUS DEFENDANTS G, H and I**, whether singular or plural, that person, firm, corporation, or entity, on whose behalf the construction activities were performed on the occasion made the basis of this suit;

**FICTITIOUS DEFENDANTS J, K and L**, whether singular or plural, that person, firm, corporation, or entity, who or which insured the party(ies) causing damages the Plaintiff made the basis of this lawsuit occurred;

**FICTITIOUS DEFENDANTS M, N and O**, whether singular or plural, is that person, firm, corporation, or entity, who or which negligently entrusted the construction/renovation activities performed on the occasions made the basis of this lawsuit;

**FICTITIOUS DEFENDANTS P, Q and R**, whether singular or plural, that person, firm, corporation, or entity, who or which was responsible for the hiring, training, and supervision of employees, agents, contactors, subcontractors and/or affiliates for construction/renovation activities on the occasion made the basis of this suit;

**FICTITIOUS DEFENDANTS S, T and U**, whether singular or plural, that person, firm, corporation, or entity, who or which destroyed, discarded, concealed, fabricated, altered or otherwise spoliated evidence relevant to the incident made the basis of this suit;

**FICTITIOUS DEFENDANTS V, W and X**, whether singular or plural, that person, firm, corporation, or entity, whose negligence, wantonness, willfulness and/or otherwise wrongful conduct caused the incident and damages made the basis of this suit;

**FICTITIOUS DEFENDANTS Y, Z and AA**, whether singular or plural, that person, firm, corporation, or entity, that is the true and correct name or names of the Defendants designated herein as P & M Mechanical, Inc., Taylor Electrical

Contractors, Inc., LS&R LLC, Automated Logic Corporation, ADCO Companies, Ltd., and Southeastern Temperature Controls Inc. d/b/a STC Worldwide;

**FICTITIOUS DEFENDANTS BB, CC and DD**, whether singular or plural, that person, firm or corporation which is the successor-in-interest of any of the named or above-described Fictitious Party Defendants;

**FICTITIOUS DEFENDANTS EE, FF and GG**, whether singular or plural, that person, firm or corporation which is the predecessor-in-interest of any of the named or above- described Fictitious Party Defendants;

**FICTITIOUS DEFENDANTS HH, LL and MM**, whether singular or plural, that person, firm, corporation, or entity, who or which was acting as an agent, employee, servant, contractor, and/or subcontractor of and for any of the above-named Defendants or above- described Fictitious Party Defendants at the times of the occurrences made the basis of this lawsuit; the identities of the Fictitious Party Defendants are otherwise unknown to Plaintiff at this time, or if their names are known to Plaintiff at this time, their identities as proper party Defendants are not known to Plaintiff at this time, but their true names will be substituted by amendment when ascertained.

## Third Amended Complaint

### I.   Introduction

1.    This action arises from appalling circumstances: Thomas Lee Rutledge, a man in the custody of the Alabama Department of Corrections at William E. Donaldson Correctional Facility in Bessemer, Alabama, was literally baked to death in his cell by excessive heat generated by the prison's heating system on December 7, 2020. He was housed on a mental health ward, where inmates were confined to their cells around the clock, including eating and bathing in their cells. His death was the direct result of the deliberate indifference or malice of the prison officials, corrections officers, and maintenance personnel at Donaldson, and of the negligence and/or

wantonness of the contractor entities and the fictitious defendants. LaVentra Denice Rutledge, in her capacity as the administratrix of Mr. Rutledge's estate, brings this action for damages pursuant to 42 USC §1983 to remedy the egregious Eighth Amendment violations that resulted in her brother's wrongful death.

## II.   <u>Parties</u>

2.     The Plaintiff, LaVentra Denice Rutledge, is the Administratrix of the Estate of her brother Thomas Lee Rutledge.

3.     The Decedent, Thomas Lee Rutledge, was a beloved son and brother. He was also a human being in the custody of the Alabama State Department of Corrections at the time of his death on December 7, 2020, when he was killed through the deliberate indifference or malice of Defendants.

4.     Defendants Corrections Officer Christie Sansing and Cory Eller, Lieutenant Tim Pope, Warden Phyllis Morgan, and Warden Kenneth Peters are employees and/or officers of the Alabama Department of Corrections. Officers Sansing and Eller and Lieutenant Pope were on duty and responsible for the welfare of inmates in T unit on December 7, 2020. Each was deliberately indifferent to the serious risk of harm from life-threatening heat in T unit. Alternately, each acted with malice for the individuals housed there. Each is sued in his or her individual capacity.

5.     Defendants Warden Phyllis Morgan and Warden Kenneth Peters are prison officials with the authority to institute policies requiring corrections officers to

institute special means to promote cooling for inmates at risk of serious injury or harm from excessive heat when temperature on a housing unit exceeds 85 degrees, regardless of the outside temperature. Defendants Warden Phyllis Morgan and Warden Kenneth Peters have the authority to require training for corrections officers of the need to institute special means to promote cooling whenever the temperature in a housing unit exceeds 85 degrees, regardless of the outside temperature.

6.      Defendant J. Rodgers, C. Dean, and G. Griffin are Corrections Officers who worked on T Unit on December 7, 2020 and who were consciously aware of the excessive, life threatening heat in T unit that evening. Each was deliberately indifferent to the serious risk of harm from life-threatening heat in T unit. Alternately, each acted with malice for the individuals housed there. Each is sued in his or her individual capacity.

7.      Defendant Plant Maintenance Supervisor III Billy Kennedy is in charge of maintenance at Donaldson. Kennedy has responsibility for maintaining and operating the boiler heating and HVAC systems at the prison

8.      The Defendant, P & M Mechanical, Inc., was the prime HVAC contractor hired by the State of Alabama to install and upgrade heating and air conditioning systems in certain portions of Donaldson Correction Facility in Bessemer.

9.     The Defendant, Taylor Electrical Contractors, Inc., was an electrical subcontractor of P&M Mechanical working on certain portions of Donaldson Correction Facility in Bessemer.

10.    The Defendant, LS&R, LLC, was an electrical subcontractor of P&M Mechanical working on certain portions of Donaldson Correction Facility in Bessemer.

11.    The Defendant, Automated Logic, was an HVAC subcontractor of P&M Mechanical working on HVAC controls in certain portions of Donaldson Correction Facility in Bessemer.

12.    The Defendants ADCO Companies, Ltd. and Southeastern Temperature Controls Inc. d/b/a STC Worldwide (Boiler Maintenance Defendants) performed maintenance on Donaldson's boilers in November and/or December 2020.

13.    Fictitious Defendants A, B and C, whether singular or plural, that person, firm, corporation, or entity, of which was engaged in construction activities, renovation, design, repair, replacement, installation, removal, demolishment of the HVAC system and/or the like, at the William E. Donaldson Correctional Facility in Bessemer, Alabama from 2019 to December 7, 2020. Fictitious Defendants D, E and F, whether singular or plural, that person, firm, corporation, or entity, responsible for designing, renovating maintaining, inspecting, repairing, replacing, installing,

removing, demolishing or equipping the HVAC system William E. Donaldson Correctional Facility in Bessemer, Alabama from 2019 to December 7, 2020;

14.     Fictitious Defendants G, H and I, whether singular or plural, that person, firm, corporation, or entity, on whose behalf the construction activities were performed on the occasion made the basis of this suit;

15.     Fictitious Defendants J, K and L, whether singular or plural, that person, firm, corporation, or entity that insured the party or parties causing damages made the basis of this lawsuit;

16.     Fictitious Defendants M, N and O, whether singular or plural, is the person, firm, corporation, or entity, that negligently entrusted the construction/renovation activities performed on the occasions made the basis of this lawsuit;

17.     Fictitious Defendants P, Q and R, whether singular or plural, that person, firm, corporation, or entity, who or which was responsible for the hiring, training, and supervision of employees, agents, contactors, subcontractors and/or affiliates for construction/renovation activities on the occasion made the basis of this suit;

18.     Fictitious Defendants S, T and U, whether singular or plural, that person, firm, corporation, or entity, who or which destroyed, discarded, concealed, fabricated, altered or otherwise spoliated evidence relevant to the incident made the basis of this suit;

19.     Fictitious Defendants V, W and X, whether singular or plural, that person, firm, corporation, or entity, whose negligence, wantonness, willfulness and/or otherwise wrongful conduct caused the incident and damages made the basis of this suit;

20.     Fictitious Defendants Y, Z and AA, whether singular or plural, that person, firm, corporation, or entity, that is the true and correct name or names of the Defendants designated herein as P & M Mechanical, Inc., Taylor Electrical Contractors, Inc., LS&R LLC, Automated Logic Corporation, ADCO Companies, Ltd., and Southeastern Temperature Controls Inc. d/b/a STC Worldwide.

21.     Fictitious Defendants BB, CC and DD, whether singular or plural, that person, firm or corporation which is the successor-in-interest of any of the named or above-described Fictitious Party Defendants;

22.     Fictitious Defendants EE, FF and GG, whether singular or plural, that person, firm or corporation which is the predecessor-in-interest of any of the named or above- described Fictitious Party Defendants;

23.     Fictitious Defendants HH, LL and MM, whether singular or plural, that person, firm, corporation, or entity, who or which was acting as an agent, employee, servant, contractor, and/or subcontractor of and for any of the above-named Defendants or above- described Fictitious Party Defendants at the times of the occurrences made the basis of this lawsuit; The identities of the Fictitious Party

Defendants are otherwise unknown to Plaintiff at this time, or if their names are known to Plaintiff at this time, their identities as proper party Defendants are not known to Plaintiff at this time, but their true names will be substituted by amendment when ascertained.

### III.    Jurisdiction and Venue

24.    The plaintiff brings the federal claims in this complaint pursuant to 42 USC §1983 for the defendants' violation of Mr. Rutledge's right to be free from cruel and unusual punishment under the Eighth Amendment of the United States Constitution. Pursuant to 28 USC §1331, the Court has subject matter jurisdiction, as the claims in this case arise under federal law. The court also has personal jurisdiction over all defendants. Venue is proper in the Northern District of Alabama, Southern Division, as the William E. Donaldson Correctional Facility is located within this district. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367.

### IV.    Factual Allegations

#### A.    Rutledge Was Sentenced to Life Without Parole as a Juvenile and Had Spent More than Half His Life in Prison.

25.    Thomas Rutledge was sentenced to life without parole in 1995 for offenses he committed as a juvenile. At the time of his death on December 7, 2020, Mr. Rutledge was forty-four years old and had spent more than half of his life in prison.

26.    Although originally sentenced to life without parole, Mr. Rutledge had his sentence reduced following a United States Supreme Court decision holding that mandatory sentences of life without the possibility for parole for juvenile offenders are unconstitutional. Had Mr. Rutledge lived, he would have become eligible for parole and possible release in 2024. Mr. Rutledge had matured and grown during his years in prison. He had dreams of obtaining his freedom, joining his mother in Alaska, and starting a new and productive life.

27.    Heartbreakingly, those dreams were cut short by Mr. Rutledge's death on December 7, 2020, when he was literally baked to death in his locked cell at William E. Donaldson Correctional Facility, a place where he had been known for his smile and his positive outlook under the most trying of circumstances.

### B.    2019-2020 HVAC Renovation Project at Donaldson.

28.    In 2019 and 2020, the Department of Corrections ("DOC") employed P & M Mechanical, Inc., along with various subcontractors including Taylor Electrical Contractors, Inc., LS&R LLC., and Automated Logic Corporation to install a new air conditioning system and controls for dorms R, S, U, V, W, X, & Y.

29.    Although T-unit shares a building with R, S, and U, the scope of the project did not include T-unit, which had an existing air conditioning system and thermostatic temperature controls that were to remain intact and functioning throughout and after the duration of the project.

30.     The new air handlers for R, S, and U were located on the roof of the prison, with duct work feeding the air down into the housing units. The new air handlers that were installed in 2019-2020 are controlled remotely by the Department of Corrections through an Automated Logic control system, which is designed to enable remote monitoring and control for dorms R, S, U, V, W, X, & Y.

31.     By contrast, the air handler for T is located within the S / T mechanical control room. The thermostatic controls for T unit are also in this room and can only be controlled locally. There is no remote monitoring of climate conditions for T unit.

32.     T unit shares a mechanical control room with S unit. This S/T mechanical control room is physically located between the two housing dorms. As stated above, S was part of the 2019-2020 HVAC renovations, meaning that old equipment had to be demolished in the shared mechanical control room and new equipment had to be installed for the new HVAC system that was to provide climate control to S unit; however, the air handler and other equipment for T unit were to remain intact.

### C.     The Prison's Heating System

33.     Heating within the prison is generated by running hot water from a central boiler plant through a heating loop that in turn runs through heating coils located in or around the mechanical control rooms. This was true before and after the 2019-2020 HVAC renovations, which did not change the heating system at Donaldson.

34.     The boiler does not produce the hot water in the heating loop directly, but rather creates steam that is piped through heat exchangers in the boiler plant. The boiler heat exchangers heat the water that circulates through the hot water heating loop, which carries the hot water for heating throughout the prison.

35.     The prison boiler heating system has inline pumps that provide hot water for heating from the boiler plant to all areas of the prison. These pumps are activated manually at the start of the cold season when it is determined that heating is required. Hot water does not flow through the prison heating system unless the pumps have been activated, which typically happens when the weather turns in the late fall.

36.     From the boiler heat exchangers, the hot water in the heating loop is piped through heating coils in the various mechanical control rooms. In all areas in the prison, air handles operate continuously to circulate air for ventilation as well as for heating and/or cooling purposes. When hot water is present in the heating coils, the air from the air handlers is heated in its passage through the coils and blown into the duct ventilation system in the housing units, providing heat to inmate cells.

37.     The majority of the prison (i.e. all units except R, S, T, U, V, W, X, & Y) is not air conditioned and lacks thermostatic controls. In the winter, when hot water is supplied by the central boiler plant, the temperature in these areas of the prison is determined by the temperature of the water in the heating loop.

38.     By adjusting the boiler, the level of heat delivered to the non-thermostatically controlled units can be adjusted and controlled. Kennedy testified that the temperature of non-air-conditioned units is "set in the boiler room" and that regulating the temperature of these areas demands "constant monitoring of the thermometers inline," which was Kennedy's responsibility.

### D.     P & M and its Subcontractors Negligently or Wantonly Destroyed Thermostatic Controls and Disconnected Power to Solenoids for T Unit.

39.     P & M and its subcontractors, Taylor Electric, Automated Logic, and/or LS&R, negligently or wantonly damaged or destroyed the thermostatic controls for T unit that were located in the S/T mechanical control room.

40.     P & M and its subcontractors also negligently or wantonly disconnected power from the solenoids that stop and start the flow of water into the heating coils for T unit.

41.     These electronically activated solenoids are connected to the thermostatic controls and are essential to their function. When the heat reaches the proper setpoint, the thermostatic controls are designed to send a signal to the solenoids to stop the flow of water and prevent continued heating.

42.     When the contractor and sub-contractors disconnected the power from the solenoids, they remained in the open position, meaning that even if the thermostatic controls had been functioning properly, they would not have been able to actuate the

solenoids to close the valves and prevent hot water from flowing through the heating coils.

43.     This meant that whenever hot water was being supplied from the central boiler plant through the inline pumps, i.e. after the system had been switched to heat with the onset of cold weather, it would flow continuously through the heating coils. Because the flow of air is continuous, T unit would be subject to continuous heating as long as the central boiler plant continued to supply hot water.

44.     In addition, as stated above, the contractors negligently or wantonly destroyed the thermostatic controls, meaning that even if the contractors had not disconnected powers from the solenoids, the thermostatic controls were no longer able to function to keep the temperature in T unit at the proper set point.

45.     In essence, as a result of the negligence or wantonness of P & M and its subcontractors, all thermostatic controls for T-unit were disabled during the HVAC renovations. After these controls were disabled, the flow of hot water through the coils that heat the air that is supplied to T-unit by the air handler was unregulated, resulting in a situation of continuous, unregulated heating to T-unit after the system was switched to heating mode following the turning of the weather in fall 2020.

###     E.     Plant Maintenance Supervisor III Billy Kennedy Discovers that Contractors Have Destroyed Thermostatic Controls for T Unit.

46.     Plant Maintenance Supervisor III Billy Kennedy is the person responsible for adjusting the thermostatic controls for T unit onsite at Donaldson, and he along with

other maintenance personnel are the only individuals who have authority to enter the S/T mechanical control room where those controls are located unescorted.

47.    Kennedy's job duties also bring him into each of the mechanical rooms, including the S/T mechanical room, at least once per month for the purpose of changing or cleaning filters and other routine maintenance tasks involving the equipment in those rooms.

48.    At some point during the 2019-2020 renovations, Kennedy discovered that P & M and/or its subcontractors, as a result of negligence or wantonness, had destroyed the thermostatic controls for T unit that were located in the S/T mechanical control room.

49.    Kennedy also discovered that P & M and/or its subcontractors had negligently or wantonly disconnected power from the solenoids that stop and start the flow of water into the heating coils for T unit.

50.    Prior to December 7, 2020 Kennedy discovered that P & M and/or its subcontractors had damaged the equipment in the S/T mechanical room.

51.    Prior to December 7, 2020, Kennedy understood that all thermostatic controls for T-unit were non-functional as a result of the damage caused by the contractors during the HVAC renovations, and that this meant that the flow of hot water through the coils that heat the air that is supplied to T-unit by the air handler was unregulated, resulting in continuous heating.

52.     Prior to December 7, 2020, Kennedy understood that as a result of the damage caused by the contractors, the only variable controlling the temperature of T-unit after the system was switched to heating mode following the turning of the weather in fall 2020 was the temperature of the water supplied by the boiler heating system.

### F.      Despite Knowing that T Unit's Thermostatic Controls Are Disabled, Plant Maintenance Supervisor Kennedy Allows the Boiler to Run Dangerously Hot.

53.     Plant Maintenance Supervisor III Billy Kennedy is the person responsible for monitoring and adjusting the boiler temperature to ensure proper heating for the non-air-conditioned areas of the prison.

54.     Pursuant to these responsibilities, Kennedy monitors and records the boiler temperature twice daily.

55.     At all times relevant to this action, Kennedy was aware that excessive heat from the boiler may result in excessive heat being delivered to housing units.

56.     The water in the boiler heating loop cools at a predictable rate during its passage through the loop that provides hot water for heating to the prison dorms. Because of this predictable cooling, the optimal temperature is between one hundred twelve and one hundred twenty degrees Fahrenheit.

57.     In 2020, prior to the onset of cold weather and the activation of the inline pumps to switch the prison climate control system to heating mode, Kennedy

observed the damage the contractors had done to the thermostatic controls for T-unit in the S/T control room.

58.     Kennedy testified that he first discovered the damage on the morning of December 8, 2020, and that the system had been working fine before that, such that Kennedy claims that the contractors must have caused the damage in the days immediately preceding December 7, 2020.

59.     This testimony appears to be incorrect, however, as records show that the contractors had substantially completed their work on the project months prior to December 7, 2020.

60.     Kennedy testified that he visits the control room at least monthly. Accordingly, Kennedy discovered the damage prior to December 7, 2020.

61.     Based on his familiarity with that system, Kennedy understood that the thermostatic controls for T-unit were non-functional as a result of the damage he observed prior to December 7, 2020.

62.     With the thermostatic controls for T-unit rendered non-functional, Kennedy was aware that the only way to control the temperature of T-unit after the system was switched to heating was by controlling the temperature of the hot water supplied by the central boiler plant. Kennedy understood the importance of keeping the temperature of the heating water at between one hundred twelve and one hundred twenty degrees Fahrenheit, and certainly not higher than one hundred thirty degrees.

63.     Kennedy was aware that T-unit housed the mental health ward of the prison, and that many, if not most of the individuals in the mental health ward were taking psychotropic medications. At all times relevant to this action, Kennedy was further aware of the special risk of bodily harm or death posed by excessive heat for such individuals.

64.     Nevertheless, despite his conscious awareness of the risk of excessive heat to individuals on T-unit, Kennedy allowed heating loop water to reach temperatures much higher than 130 degrees while knowing that the thermostatic controls for T-unit were non-functioning as a result of the contractors' negligence or wantonness. In allowing the system to run hot, Kennedy was deliberately indifferent to the known risk that his actions would expose individuals in T unit to excessive heat.

### G. **Defendants ADCO Companies, Ltd., and Southeastern Temperature Controls Inc. d/b/a STC Worldwide Perform Maintenance on Boiler and Bypassed the Pressure Release Valve and/or Steam Regulator**.

65.     Defendant's boiler was equipped with a pressure release valve and/or steam regulator.

66.     In November 2020, a service technician from Southeastern Temperature Controls Inc. d/b/a STC Worldwide provided service on the boilers at Donaldson. According to the service ticket, from November 16 through November 20, 2020, the service technician "[s]hut off all water and all valves" and "[r]emoved old heat

exchangers and installed new heat exchangers with new gaskets and re installed condensate loops."

67.   On November 30, 2020, the service technician from Southeastern Temperature Controls Inc. d/b/a STC Worldwide returned to Donaldson and, according to the service ticket, "[s]tarted up boilers and opened bypass because the steam regulator wouldn't let steam through." On or around this date, Kennedy testified that he visited the S/T mechanical room to check the inline thermometers there. Kennedy testified, "Anytime the boiler room is shut down and brought back online … all of the mechanical rooms have to be checked."

68.   Also on November 30, 2020, Defendant Peters sent an email stating "Donaldson maintenance reports that the boilers are repaired and the heat is back on."

69.   As a result of the negligence and/or wantonness of the service technician from Southeastern Temperature Controls LLC d/b/a STC Worldwide LLC, after November 30, 2020, the boiler steam regulator and/or pressure release were bypassed. And, as stated above, the thermostatic controls in T unit had been destroyed and/or disconnected by the negligence of the contractor defendants.

70.   Kennedy was aware that the boiler system's pressure relief valves were not functioning, and on December 1, 2020, he met with a service technician from

Defendant ADCO Companies, Ltd. who had arrived at the prison to conduct additional boiler maintenance, including "Troubleshoot Relief Valves."

71.    The service ticket completed by the ADCO technician for December 1, 2020 includes the following description of work completed:

> Arrived to site and waited on customer to return to the boiler room. Upon arrival the customer had the make up water feed station cut off do to repairs of replacing the feed water make up line. This had the entire boiler room shut down. After the customer made their repairs I started the boiler #3 to go over issues. The customer had water bouncing in the sight glass because of to much chemical in the boiler. Also adjusted the modulation pressure control to keep the boiler from ramping to close to the off set point. The customer was also questioning the PRV from the main steam line to the hot water heat exchanger. Could not verify the steam pressure on the outlet side of the PRV due to no tappings in the steam line between the PRV and heat exchanger. The customer also had no clue what the steam pressure should be reduced to. The PRV seemed to be heating the hot water loop with no problem but it is unknown what the pressure is coming out.

72.    The "customer" referred to in the technician's narrative is Kennedy, who was present and personally observed the condition of the boiler heating system on December 1, 2020. Based on his interactions with the Southeastern Temperature Controls LLC d/b/a STC Worldwide LLC and ADCO technicians, Kennedy was aware there was a problem with the pressure relief valve ("PRV") and/or steam regulator. Kennedy was further aware, as stated above, that the technician from Southeastern Temperature Controls LLC d/b/a STC Worldwide LLC had decided to bypass the steam regulator on November 30, 2020 to "let steam through" and allow the steam to be delivered from the boiler to the heat exchangers.

73.   The ADCO technician who serviced the boiler heating system on December 1, 2020 was aware that the system was unsafe, but he negligently and/or wantonly performed repairs that permitted Kennedy to continue operating the system under unsafe conditions, with a bypassed and/or non-functioning steam regulator and/or pressure relief valve.

### H.   On November 2, 2020, Kennedy Operates the Boiler with the Steam Regulator and/or Pressure Release Valve in Bypass Mode to Restore Heating to the Prison.

74.   Based on his interactions with the ADCO technician on December 1, 2020, Kennedy was aware that the pressure release valve and/or steam regulator were not functioning properly, and that the pressure reaching the heat exchangers was unknown.

75.   Kennedy was further aware, based on his prior knowledge that the thermostatic controls in the S/T control room had been destroyed and/or disabled, meaning that there were no remaining safety systems to prevent the boiler heating system from delivering continuous, uncontrolled, and excessive heating to T-unit.

76.   On Wednesday, December 2, 2020, Defendant Peters sent an email at 8:18 AM stating that "Unfortunately, I am reporting that one of the two Donaldson Boilers has stopped working again last night/this morning and the other one is not working correctly. Facility maintenance is checking it now and will update me when they have a determination."

77.    At 10:13 AM that same morning, Warden Peters provided the following update: "Be advised that facility maintenance has the boilers back up at Donaldson so once again, the heat is back on. Maintenance, Mr. Kennedy, is contacting the Engineering division to have the contractor come back out and re-check the boilers, but they are working for now."

78.    Between these two emails on the morning of Wednesday, December 2, 2020, Kennedy bypassed the steam regulator and/or pressure relief valve to allow steam from the boiler to reach the heat exchangers and heat the heating loop. Kennedy was aware that operating the boiler under such conditions would result in continuous, unregulated, and excessive heat being delivered from the boiler to the heat exchangers, resulting in continuous, unregulated heating of the hot water heating loop and continuous, uncontrolled heating in T unit, where, as stated above, he was aware that the thermostatic controls had also been disconnected and/or destroyed.

### I.    Inmates in T Unit Complain of Excessive Heat All Weekend.

79.    By the weekend, inmates in in T unit had begun complaining of the excessive heat. In a recorded statement, Kennedy told Agent Clark Hopper that "[i]t's my understanding that they had they had been complaining all weekend," i.e. December 5 and 6, 2020.

80.    Every corrections officer who worked in or around T unit on December 5, 6, or 7, 2020 was aware of the life-threatening conditions of excessive heat in T unit that weekend, up to and including Monday, December 7, 2020.

81.    Defendant Rodgers worked in T unit on December 5, 2020, first shift, December 6, third shift, and December 7, first shift.

82.    Defendant Sansing worked in T unit on December 5, 2020, second shift, December 6, second shift and at least part of third shift.

### J.    Kennedy Allows the Heating Water Temperature to Exceed 130 Degrees and Then Allows the Boiler Temperature Logs to Be Destroyed after the DOC Receives Plaintiff's Subpoena.

83.    By Monday, December 7, 2020, the temperatures in the heating loop significantly exceeded 130 degrees, perhaps reaching as high as 200 degrees, resulting in life-threatening conditions in T-unit. Because Kennedy measured and recorded the temperatures on Monday in accordance with his usual practice, he was consciously aware of the high temperature of the heating water loop on this day, and consciously aware of the risk to overheating for individuals on T unit as a result of the non-operational thermostatic controls combined with the excessive heat from the boiler. Nonetheless, Kennedy failed to shut down the boiler or alert prison officials.

84.    On September 22, 2021, Plaintiff sent a subpoena to the Alabama Department of corrections including the following request:

> Provide all documents relating to the boiler heating system or any other heating system and associated thermostat or control systems in T unit,

including all documents showing the manufacturer of the boiler and any thermostat or control system, all manuals, handbooks, or schematics showing the construction of the heating system and its associated thermostat or control systems, all records of maintenance, modifications, or service to the heating system or any associated thermostat or control system, and all documents and records of any kind, wherever stored, relating to any malfunction or improper functioning of the boiler heating system or its control systems.

85.    In response to this request, the Department of Corrections objected and did not produce the boiler logs for December 2020.

86.    The boiler logs for December 2020 existed at the time the Department of Corrections received the September 22, 2021 subpoena. Kennedy was the person who maintained and personally had possession of those logs.

87.    The boiler logs for December 2020 have now been destroyed.

88.    Kennedy testified that the boiler logs were destroyed in a flood purportedly caused by a burst water pipe in the boiler room.

89.    To the extent such an event occurred, maintenance records make clear that it took place in December 2021, months after the Department of Corrections' receipt of the above-referenced subpoena.

### K.    Thomas Rutledge's Conditions of Confinement.

90.    Mr. Rutledge was housed in a single cell in the "T unit" housing dorm, according to the Jefferson County Coroner's report. The "T unit" at Donaldson is what is known as a "Residential Treatment Unit" ("RTU") under Defendant's policies.

90.    According to the Coroner's report, "on the mental health ward the decedent/other inmates never leave their cells, they eat/bathe in their cells."

91.    Mr. Rutledge was taking psychotropic medication, which increases the risk of heat-related illness.

92.    Mr. Rutledge's cell contained a heating vent but no means of regulating the heat output to the cell; nor did Mr. Rutledge have any effective means of regulating the temperature in his cell.

93.    Because Mr. Rutledge was housed on his own in the mental health ward and not permitted to leave his cell, Defendants Corrections Officers Christie Sansing, and Cory Eller and Lieutenant Tim Pope and Officers J. Rodgers, C. Dean, and G. Griffin were aware of the need to check on him on a regular basis. As a result of their training on prison policies, Defendants were also aware of the heightened risk of heat-related illness for individuals such as Mr. Rutledge taking psychotropic medication and of the need to personally perform frequent checks when the temperature is above eighty-five degrees, as recognized by Defendant's "Psychotropic Medication and Heat" Policy, as explained below.

### L.    The Prison's "Psychotropic Medication and Heat" Policy Recognizes the Risk of Heat-Related Illness and the Need for Special Cooling Measures When Temperatures in Housing Units Exceed Eighty-Five Degrees.

94.    The "Psychotropic Medication and Heat" policy states that "Inmates who take psychotropic medication will not be exposed to sustained elevated ambient

temperatures or direct sunlight. When the outside temperature reaches 85 degrees Fahrenheit, special means will be initiated to promote cooling, and should be started at lower temperatures if inmates report heat-related symptoms or distress."

95.     The policy further states that "Corrections Officers are responsible for: 1. Monitoring and recording the temperature inside cells and dormitories" and "2. Initiating measures to provide extra means of cooling when the temperature reaches 85 degrees," among other responsibilities.

96.     Defendant's "Psychotropic medication and heat" policy further states:

C. Correctional Officers will

1. Monitor all cell and dormitory temperatures at least three times daily when the outside temperature reaches 85 degrees Fahrenheit.

2. Record the temperatures on ADOC Form MH-026, Housing Unit Temperature Log.

3. Take the following steps if the temperature in a housing area reaches 85 degrees.

a) Notify the Shift Commander and Warden.

b) Use fans to increase ventilation.

c) Offer and provide fluids and ice on request.

d) Allow additional showers to provide cooling.

D. If these efforts are insufficient the Warden will consider authorizing a temporary move to a cooler area.

The Housing Unit Temperature Log, which is part of the Psychotropic Medications and Heat Policy, further states that "[i]f the temperature in a cell or housing area reaches 90 degrees, 1. Remove the affected inmate(s) to a cooler cell or area. 2. Notify the shift commander and the Health Services Administrator or nurse manager in the health care unit."

97.    Officers Sansing and Eller and Lieutenant Pope and Officers J. Rodgers, C. Dean, and G. Griffin had been trained in this policy and were aware of the substantial risk of harm posed to inmates from extreme heat. They were also aware of the need to initiate special means to promote cooling when the temperature in a housing unit rises above 85 degrees. The policy further states that "[e]ach facility Warden is responsible for ensuring that correctional staff understand and implement their responsibilities to address heat-related health concerns."

98.    Pursuant to the "Residential Treatment Unit" policy, security posts in the RTU are permanent assignments to promote consistency in the Correctional Officers assigned. The policy further states that "Corrections Officers assigned to the RTUs shall receive specialized training in serious mental illness and the ADOC mental health administrative regulations." Accordingly, Officers Sansing, and Eller and Lieutenant Pope and J. Rodgers, C. Dean, and G. Griffin were familiar with the RTU

and the special needs of the inmates there. Based on inmates using clothing and other articles to block vents and officers' own sense perceptions, Officers Sansing and Eller and Lieutenant Pope and J. Rodgers, C. Dean, and G. Griffin were also aware that temperatures in T unit regularly exceed 85 degrees in the winter when the boiler is running, and that as a result, inmates are regularly subjected to temperatures that Defendant's own policies identify as potentially life threatening for certain inmates, particularly inmates such as Mr. Rutledge who are taking psychotropic medications as identified in Defendant's "Psychotropic Medication and Heat" Policy.

99.    In an effort to protect themselves, some inmates have attempted to limit the heat output to their cells by stuffing clothing in the vents to reduce the heat output. However, such measures are ineffective in limiting the heat output because the boiler itself cannot be turned off or controlled by inmates. The fact that inmates have attempted such ineffective measures to counter the regular excessive heat from the boiler on T unit was known to Officers Sansing and Eller and Lieutenant Pope and Officers J. Rodgers, C. Dean, and G. Griffin.

**M.    On the Evening of December 7, 2020, the Prison's Boiler System Created an Environment of Life-Threatening Heat, Presenting an Acute and Immediate Risk of Deadly Harm to Inmates Housed There.**

100.    The weather on December 7, 2020, was mild, with outdoor high temperatures in the mid-forties Fahrenheit and a low of around thirty degrees.

101.   However, on the evening of December 7, the prison's boiler system created an environment of life-threatening heat in T unit, presenting an acute and immediate risk of deadly harm to the inmates housed there that evening.

102.   The Jefferson County Coroner's report states that Mr. Rutledge "was in a cell with a temperature reported to be 101-104° F. He was found unresponsive, and his body temperature was recorded at 109° F when persons were trying to resuscitate him."

103.   These temperature readings were taken a considerable amount of time after the door to the cell had been opened and medical staff had tried unsuccessfully to resuscitate Mr. Rutledge. The temperature of the cell prior to the door being opened was far in excess of the above temperature readings. Human beings cannot survive without remedial measures in temperatures above 101-104° for extended periods of time.

104.   Officer Sansing and Eller and Lieutenant Pope were on duty and responsible for the welfare of inmates in T unit on December 7, 2020. Officers Rodgers, Dean, and Griffin were likewise on duty and responsible for the welfare of inmates in T unit on December 7, 2020.

105.   Officer Rodgers conducted "living and breathing" checks on T unit at 4:05 PM and 5:05 PM and a "security check" at 4:35 PM and thus was aware of the excessive life-threatening heat in T unit that evening; however, showing deliberate

indifference, Officer Rodgers took no action but instead reported "all 96 units alive & well" and "all 96 units secure."

106.   Similarly, Officer Dean conducted a "living and breathing" check on T unit at 6:05, 7:05 and 8:05 PM and a "security check" on T unit at 5:35 PM and thus was aware of the excessive life-threatening heat in T unit that evening; however, showing deliberate indifference, Officer Dean took no action but instead reported "all 96 units alive & well" and "all 96 units secure." However, Rutledge was already suffering from life-threatening heat distress at this point, as at 8:20 PM an inmate runner reported to the cube officer, Sansing, that Rutledge was nonresponsive.

107.   Similarly, Officer Griffin conducted security checks at 6:35 PM and 7:35 PM and thus was aware of the excessive life-threatening heat in T unit that evening; however, showing deliberate indifference, Officer Griffin took no action but instead reported "all 96 units secure." However, Rutledge was already suffering from life-threatening heat distress at this point, as at 8:20 PM an inmate runner reported to the cube officer, Sansing, that Rutledge was nonresponsive.

108.   The excessive heat far in excess of one hundred degrees was obvious to officers who conducted living and breathing checks and security checks or who otherwise interacted with inmates in their cells. Investigator Clark Hopper, who was present on the ward that evening after Mr. Rutledge's death, commented in a recorded interview that when he opened a tray door to speak with Scott Abbot, a

prisoner in one of the cells on T-unit, the experience was like "opening the oven and when you [are] getting something out of the oven and it hits your face." Hopper stated, "when he dropped his … meal door … it was, it was just, pardon the language but it was hotter than three hells when it dropped." Hopper commented, "And so I know he was suffering obviously just as much as Inmate Rutledge."

109.   Officers Dean and Griffin also assisted with taking inmates in T unit for showers and thus were aware of the excessive life-threatening heat in T unit that evening; however, showing deliberate indifference, these officers took no action.

110.   Each of these officers was consciously aware of excessive, life threatening temperatures on T unit that were well in excess of eighty-five degrees, and in excess of ninety degrees. They were aware of the "Psychotropic medication and heat", which states:

> C. Correctional Officers will
>
> […]
>
> 3. Take the following steps if the temperature in a housing area reaches 85 degrees.
>
> > a) Notify the Shift Commander and Warden.
> >
> > b) Use fans to increase ventilation.
> >
> > c) Offer and provide fluids and ice on request.
> >
> > d) Allow additional showers to provide cooling.

They were further familiar with the Housing Unit Temperature Log, which is part of the "Psychotropic Medications and Heat" Policy and states that "[i]f the temperature in a cell or housing area reaches 90 degrees, 1. Remove the affected inmate(s) to a cooler cell or area. 2. Notify the shift commander and the Health Services Administrator or nurse manager in the health care unit." Despite such awareness, they took no actions to safeguard the welfare of inmates in T-unit, directly resulting in Mr. Rutledge's death. They were aware that the excessive heat on December 7, 2020 constituted an acute and immediate risk of deadly harm to the inmates housed there that evening, and particularly to inmates taking psychotropic medications such as Mr. Rutledge; again, however, they took no action whatsoever.

### N.   Rutledge Died of Hyperthermia as a Direct Result of Life Threatening Temperatures In Excess of 101-104° Fahrenheit in His Housing Unit.

111.   The autopsy report states that Mr. Rutledge was found "in his cell sitting near the window of his cell with his head/face out the window believed attempting to breath/obtain cool/cold air."

112.   The autopsy showed no visible disease or injury that would account for Mr. Rutledge's death. Hyperthermia leaves no visible trace after death. Toxicological analysis detected neither ethanol nor any illicit drug in his body.

113.   The Coroner determined, based on the circumstances surrounding the death and the findings at autopsy, that Mr. Rutledge died of hyperthermia. The only cause

of death identified by the Coroner was hyperthermia. However, even if there were another cause of death, the excessive heat in Mr. Rutledge's cell would remain a determinative factor.

      **O.**    **The Correctional Defendants Were Consciously Aware of the Acute and Immediate Risk of Deadly Harm Presented by the Life-Threatening Conditions on T Unit but Were Deliberately Indifferent to that Risk.**

114.  The Coroner's report states that "[t]he manner of death is best classified as 'accident' for public health certification."

115.  However, Mr. Rutledge's death was no accident. Rather, it was the direct result of the deliberate indifference of the Correctional Defendants (Officers Sansing, J. Rodgers, C. Dean, and G. Griffin, C. Eller, and Lt. Pope and Maintenance Supervisor Kennedy) and the negligence and/or wantonness of the Contractor Defendants (P & M Mechanical, Inc., Taylor Electrical Contractors, Inc., LS&R LLC, Automated Logic Corporation) and the negligence and/or wantonness of the Boiler Maintenance Defendants (ADCO Companies, Ltd. and Southeastern Temperature Controls Inc. d/b/a STC Worldwide).

116.  The negligence and/or wantonness of the Contractor Defendants and Boiler Maintenance Defendants operated in concert with the deliberate indifference of corrections officers and prison officials who failed to take action as temperatures rose to dangerous levels in T unit, with the deliberate indifference of Maintenance Supervisor Kennedy who observed the damage to the controls for T unit and

understood the ramifications of that damage for the heating of T unit but failed to take action, and with the deliberate indifference of Maintenance Supervisor Kennedy who knowingly operated the boiler heating system with no functioning safety systems and who knowingly allowed the boiler heating system to run too hot.

117.   As stated above, P & M and its subcontractors, Taylor Electric, Automated Logic, and/or LS&R, negligently or wantonly damaged or destroyed the thermostatic controls for T unit that were located in the S/T mechanical control room. P & M and its subcontractors also negligently or wantonly disconnected power from the solenoids that stop and start the flow of water into the heating coils for T unit. Because these controls were disabled, the heating system failed to regulate the flow of hot water through the coils that heat the air that is supplied to T-unit by the air handler, resulting in a state of continuous, unregulated heating in T-unit, leading directly to the excessive heat that caused Mr. Rutledge's death.

118.   As stated above, The ADCO technician who serviced the boiler heating system on December 1, 2020 was aware that the system was unsafe, but he negligently and/or wantonly performed repairs that permitted Kennedy to continue operating the system in unregulated and uncontrolled fashion. Similarly, as a result of the negligence and/or wantonness of the service technician from Southeastern Temperature Controls LLC d/b/a STC Worldwide LLC, after November 30, 2020, the boiler steam regulator no longer functioned to prevent uncontrolled heating of

the hot water heating loop that supplies hot water for the heating throughout the prison.

119.   As stated above, Officers Sansing and Eller and Lieutenant Pope and Officers J. Rodgers, C. Dean, and G. Griffin were on duty and responsible for the welfare of inmates in T unit on December 7, 2020. They were assigned to T unit and were familiar with the special needs of inmates and with the conditions there. They were consciously aware of the excessive, life threatening temperatures on T unit on December 7, 2020. Inmates in T unit had been complaining of the excessive heat "all weekend," i.e. December 5 and 6. Every corrections officer who worked in or around T unit on December 7, 2020, including Officers Sansing and Rodgers, was aware of the life threatening conditions of excessive heat.

120.   As stated above, prior to December 7, 2020, Kennedy understood that as a result of the damage caused by the contractors and the actions of the boiler technicians, the only variable controlling the temperature of T-unit after the system was switched to heating mode following the turning of the weather in fall 2020 was by controlling the temperature of the water supplied by the boiler heating system. Because Kennedy measured and recorded the water temperatures in accordance with his usual practice on December 7, 2020 and on preceding days, he was consciously aware of the high temperatures in the boiler heating water loop on December 7, 2020, and consciously aware that this would result in dangerously high temperatures in T

unit and of the substantial risk to overheating for individuals on T unit as a result of the non-operational thermostatic controls. Nonetheless, Kennedy failed to take remedial measures or alert prison officials.

121.   The corrections officers, including Sansing, Rodgers, Eller, Dean, and Griffin were further aware that the excessive heat on December 7, 2020 constituted an acute and immediate risk of deadly harm to the inmates housed there that evening. Nonetheless, these defendants were deliberately indifferent to the substantial and immediate risk of serious harm caused by the excessive heat in T unit on December 7, 2020. They failed to take action to protect Mr. Rutledge and others from serious injury or death, despite conditions presenting an obvious acute and immediate risk to human life. Their actions and inactions, constituting deliberate indifference, were malicious. Their actions and inactions proximately caused Mr. Rutledge's death that evening.

122.   As stated above, Officers Sansing, and Eller and Lieutenant Pope and Officers Rodgers, Griffin, and Dean were aware that the temperature on December 7, 2020 vastly exceeded 85 degrees in T unit. However, they consciously disregarded both their training and the Psychotropic Medications and Heat policy, which they knew required them to a) notify the shift commander and warden; b) use fans to increase ventilation; c) offer and provide fluids and ice on request; and d) allow additional showers to provide cooling. Officers Sansing and Eller and Lieutenant Pope and

Officers Rodgers, Griffin, and Dean were also aware that the temperature on December 7, 2020 vastly exceeded 90 degrees in T unit. They were familiar with Housing Unit Temperature Log, which is part of the "Psychotropic Medications and Heat" Policy and states that "[i]f the temperature in a cell or housing area reaches 90 degrees, 1. Remove the affected inmate(s) to a cooler cell or area. 2. Notify the shift commander and the Health Services Administrator or nurse manager in the health care unit." Despite such awareness, they took no actions to safeguard the welfare of inmates in T-unit, directly resulting in Mr. Rutledge's death.

123. Defendant Lt. Tim Pope completed an incident report regarding Mr. Rutledge's death. The incident report includes a narrative stating as follows:

> On 7 December 20 at approximately 8:20PM, Officer Christie Sansing was advised by a T-Block Runner that Inmate Tommy Rutledge B/183416 (T-13 - NKGA) was unresponsive. At approximately 8:21PM, Officer Sansing called for a supervisor to report to t-Block. At approximately 8:22PM, Officer Corey Eller entered T-Block. At approximately 8:25PM, Lieutenant Tim Pope entered T-Block and went directly to cell T-13 where he found Inmate Rutledge sitting up on his bed unresponsive. At approximately 8:26PM, Lieutenant Pope contacted the Infirmary and asked for Medical Staff to report to T-Block with a gurney and an AED. At approximately 8:28PM, Medical Staff entered t-Block and immediately began CPR on Inmate Rutledge. At approximately 8:29PM Medical Staff deployed the AED and continued CPR until approximately 8:55PM. At approximately 8:56PM, Inmate Rutledge was moved to the Infirmary where CPR was continued. At approximately 8:57PM, Lieutenant Pope advised Warden II Phyliss Morgan of this incident. At approximately 8:59PM, Lieutenant Pope advised Warden III Kenneth Peters of this incident. At approximately 9:00PM, Lieutenant Pope contacted 1&1 Investigator Terry Loggins and advised him of this incident. At approximately 9:10 PM, an RPS ambulance arrived at the WEDCF Back Gate with

Paramedics Bridgett and Mathis. At approximately 9:20PM, Paramedics Bridgett and Mathis departed the WEDCF Back Gate without Inmate Rutledge. At approximately 9:13 PM, On-Call Physician Walter Wilson pronounced Inmate Rutledge deceased. At approximately 9:27PM, Lieutenant Pope advised Regional Coordinator Edward Ellington of this incident. At approximately 9:36PM, Lieutenant Pope advised Chaplain George Adams of this incident. At approximately 9:40PM, Chaplain Adams advised Lieutenant Pope that he was able to contact Inmate Rutledge's next of kin, his mother, Kathy Rutledge. Inmate Rutledge's final cause of death is pending Autopsy Report.

124. Further showing deliberate indifference and in an apparent attempt to conceal culpability, Defendant Pope failed to include crucial information in this report: a handwritten "death report" form states "Per Lt Pope temp of cell and surrounding cells ranged between 101°→ 104°." However, Lt. Pope omitted this crucial information from his report in an apparent effort to minimize documentation of correction officers' knowledge of conditions of excessive heat posing an immediate and acute risk of deadly harm to inmates, and their failure to take the steps outlined in the Excessive Heat and Psychotropic Medications policy.

### P.    The Contractor Defendants Admitted Responsibility.

125. As stated above, Plant Maintenance Supervisor II Billy Kennedy testified that after Mr. Rutledge's death, he entered the mechanical room on the morning of December 8, 2020 and discovered then for the first time that defendants had destroyed the thermostatic controls for T unit and that they had disconnected the power from the solenoids that control the flow of hot water through the heating coils.

126.   After installing new thermostatic controls and reconnecting power to the solenoids, Kennedy notified Johnny Rush, Program Director at the Engineering Administrative Division of the Department of Corrections, and informed him what the contractors had done.

127.   After Mr. Rutledge's death, Allen Swinney from P & M, along with one or more other individuals from P & M and/or another contractor Defendant came to the prison and inspected the damage in the S / T mechanical room.

128.   Billy Kennedy, Johnny Rush, and Greg Holder from the Department of Corrections were also present when Swinney and the second individual inspected the damage.

129.   After viewing the damage to the equipment in the mechanical room, Swinney and the second individual admitted to the Department of Corrections officials that P & M and/or its subcontractors were responsible for the damage to the equipment and to the damage to the wiring controlling the thermostatic controls, solenoids, and/or other heating and cooling control equipment to the T-Unit.

**Q.   Prison Staff Were Aware of a Previous Occasion When an Inmate Died of Excessive Heat on T Unit as a Result of the Boiler Heating System.**

130.   December 7, 2020 was not the first time that incarcerated persons in T unit were subjected to life threatening excessive heat as a result of the boiler. Prison officials, including Warden Phyllis Morgan and Warden Kenneth Peters, had long

been aware of problems with the boiler that posed a substantial risk of serious harm to incarcerated persons as a result of excessive heat produced by the boiler system.

131.   On Tuesday, December 8, 2018, Deborah Crook, the Director of Mental Health Services at Donaldson, sent an email stating as follows: "Inmate death last night - Initial Core temperature 109.7 - repeated around 40 minutes post mortem 108.1 Inmate house in Donaldson RTU in T-13. He was on psychotropic (mental health) medication and a Extremely high post mortem temperature is recognized as a sign of neuroleptic syndrome which could have led to his death. The HSA has contacted the institution to check the heat temperature of the cells in T unit. It has been several years ago, but we had a major dysfunction of the boiler at Donaldson in T housing dorm, which lead [sic] to a fatal case."

132.   Accordingly, Mr. Rutledge was not the first to die under similar circumstances. The circumstances of that earlier death, similar to the circumstances that led to Mr. Rutledge's death, were generally known to individuals working at the prison, including each of the named defendants. The individually named defendants were aware of the substantial, acute, and immediate risk of serious harm, including death, to incarcerated persons as a result of excessive heat in T unit.

**R.**   **Prison Officials, Including Defendants Warden Phyllis Morgan and Warden Kenneth Peters, Were Deliberately Indifferent to the Need to Institute Policies and Training Requiring Special Means of Cooling When Temperatures Rise Above Eighty-Five Degrees in Housing Units, Regardless of the Outside Temperature.**

133.   Based on the history of inmate death and/or injury resulting from past "major dysfunction" of the boiler at Donaldson in T housing dorm, and based on the obvious and known risk of substantial harm to inmates from excessive heat as recognized by Defendant's own "Psychotropic Medication and Heat" Policy, prison officials were aware of the need to train corrections officers to perform year round temperature checks, not just during periods of time when the outside temperature exceeds 85 degrees. However, Defendant's "Psychotropic Medication and Heat" Policy arguably only requires temperature checks and special means to promote cooling during times when the outside temperature rises over 85 degrees.

134.   Defendants Warden Phyllis Morgan and Warden Kenneth Peters had authority to institute policies requiring corrections officers to institute special means to promote cooling for inmates at risk of serious injury or harm from excessive heat when temperature on a housing unit exceeds 85 degrees, regardless of the outside temperature. The "Psychotropic Medications and Heat" Policy further states that "[e]ach facility Warden is responsible for ensuring that correctional staff understand and implement their responsibilities to address heat-related health concerns." Defendants Warden Phyllis Morgan and Warden Kenneth Peters had the authority to require training for corrections officers of the need to institute special means to promote cooling whenever the temperature in a housing unit exceeds 85 degrees, regardless of the outside temperature.

135.   Defendants Warden Phyllis Morgan and Warden Kenneth Peters were aware that temperatures in T unit regularly exceeded 85 degrees when the boiler was running in the wintertime. Defendants Warden Phyllis Morgan and Warden Kenneth Peters were aware that as a result, inmates are regularly subjected to temperatures that Defendant's own policies identify as potentially life threatening for certain categories of inmates, for instance inmates taking psychotropic medications as identified in Defendant's "Psychotropic Medication and Heat" Policy.

136.   However, despite the obvious and known risk of substantial harm to inmates from excessive heat as recognized by Defendant's own "Psychotropic Medication and Heat" Policy, Defendants Warden Phyllis Morgan and Warden Kenneth Peters failed to institute policies requiring corrections officers to institute special means to promote cooling for inmates at risk of serious injury or harm from excessive heat when temperature on a housing unit exceeds 85 degrees, regardless of the outside temperature. The failure to institute such policies constitutes deliberate indifference to the obvious need of inmates to be free of life-threatening excessive heat, as recognized by Defendant's own "Psychotropic Medication and Heat" Policy.

137.   Moreover, despite the obvious and known risk of substantial harm to inmates from excessive heat as recognized by Defendant's own "Psychotropic Medication and Heat" Policy, Defendants Warden Phyllis Morgan and Warden Kenneth Peters failed to require training for corrections officers of the need to institute special means

to promote cooling whenever the temperature in a housing unit exceeds 85 degrees, regardless of the outside temperature. The failure to require such training constitutes deliberate indifference to the obvious need of inmates to be free of life-threatening excessive heat, as recognized by Defendant's own "Psychotropic Medication and Heat" policy.

138.   These Defendants' deliberate indifference, resulting in the failure to institute such policies and/or the failure to train corrections officers regarding the need for temperature checks and protective measures, was the direct and proximate cause of Mr. Rutledge's death as a result of conditions constituting cruel and unusual punishment in violation of the Eighth Amendment.

**First Cause of Action: Wrongful Death – Eighth Amendment to the United States Constitution via 42 USC §1983 – Defendants Sansing, Eller, Pope, Rodgers, Griffin, and Dean – Individual Capacity Liability for Deliberate Indifference.**

139.   Mr. Rutledge was confined for an excessive, life-threatening period of time to a cell with a temperature well in excess of one hundred and four degrees Fahrenheit and inadequate ventilation, amounting to cruel and unusual punishment in violation of the Eighth Amendment. The conditions of confinement in Mr. Rutledge's cell constituted an extreme deprivation of Mr. Rutledge's clearly established Eighth Amendment rights.

140.   Officials responsible for the safety and wellbeing of individuals housed in T unit, including Defendants Sansing, Rodgers, Eller, Pope, Griffin, and Dean, were

aware of the excessive heat in the facility on December 7, 2020. They were further aware that this excessive heat represented a substantial and immediate risk of serious harm for the inmates who were housed there. As stated above, Officers Sansing, and Eller and Lieutenant Pope and Officers Rodgers, Griffin, and Dean were on duty and responsible for the welfare of inmates in T unit on December 7, 2020. They were consciously aware of the excessive, life threatening temperatures on T unit but took no actions to safeguard the welfare of inmates in T-unit, directly resulting in Mr. Rutledge's death. These individuals were deliberately indifferent to the substantial and immediate risk of serious harm caused by the excessive heat in T unit. They failed to take action to protect Mr. Rutledge and others from serious injury or death, despite an obvious substantial and immediate risk to human life. Their actions and inactions, in addition to constituting deliberate indifference, were malicious. Out of deliberate indifference or malice, they failed to take reasonable measures to guarantee the safety of the inmates confined to T unit.

141.   As stated above, Officers Sansing, and Eller and Lieutenant Pope and Officers Rodgers, Griffin, and Dean were aware that the temperature on December 7, 2020 vastly exceeded 85 degrees in T unit. However, they consciously disregarded both their training and the Psychotropic Medications and Heat Policy, which they knew required them to a) notify the shift commander and warden; b) use fans to increase ventilation; c) offer and provide fluids and ice on request; and d) allow additional

showers to provide cooling. Similarly, Officers Sansing, and Eller and Lieutenant Pope and Officers Rodgers, Griffin, and Dean were aware that the temperature on December 7, 2020 vastly exceeded 90 degrees in T unit. They were familiar with Housing Unit Temperature Log, which is part of the "Psychotropic Medications and Heat" Policy and states that "[i]f the temperature in a cell or housing area reaches 90 degrees, 1. Remove the affected inmate(s) to a cooler cell or area. 2. Notify the shift commander and the Health Services Administrator or nurse manager in the health care unit." Despite such awareness, they took no actions to safeguard the welfare of inmates in T-unit, directly resulting in Mr. Rutledge's death.

142.   Mr. Rutledge's death of hyperthermia was the direct and proximate result of these defendants' deliberate indifference or malice to conditions of confinement amounting to cruel and unusual punishment.

**Second Cause of Action: Wrongful Death – Eighth Amendment to the United States Constitution via 42 USC §1983 – Defendant Kennedy – Individual Capacity Liability for Deliberate Indifference.**

143.   Based on his familiarity with the heating controls for T-unit, Defendant Kennedy understood that the thermostatic controls for T-unit were non-functional as a result of damage he observed prior to December 7, 2020.

144.   With the thermostatic controls for T-unit rendered non-functional, Kennedy was aware that the only way to control the temperature of T-unit after the system was switched to heating was by controlling the temperature of the hot water supplied

by the central boiler plant. Kennedy further understood that the boiler pressure relief valve and/or pressure regulator were non-operational. Kennedy understood the importance of keeping the heating water temperature at between one hundred twelve and one hundred twenty degrees Fahrenheit, and certainly not higher than one hundred thirty degrees.

145.   Kennedy was aware that T-unit housed the mental health ward of the prison, and that many, if not most of the individuals in the mental health ward were taking psychotropic medications. At all times relevant to this action, Kennedy was further aware of the special risk of bodily harm or death posed by excessive heat for such individuals.

146.   Nevertheless, despite his conscious awareness of the risk of excessive heat to individuals on T-unit, Kennedy allowed the boiler to run hot so that heating loop water temperature exceeded 130 degrees while knowing that the thermostatic controls for T-unit were non-functioning as a result of the contractors' negligence or wantonness, and either while bypassing the boiler's pressure relief valve and/or pressure regulator or while those devices were non-operational. In allowing the boiler to run hot, resulting in excessive heating of the heating water loop, Kennedy was deliberately indifferent to the known risk that his actions would expose individuals in T unit to excessive heat.

147.   On Monday, December 7, 2020, as detailed above, heating water temperatures rose to in excess of 130 degrees, resulting in life-threatening conditions in T-unit. Because Kennedy measured and recorded temperatures in accordance with his usual practice, he was consciously aware of the high temperatures on this day, and consciously aware of the risk to overheating for individuals on T unit as a result of the non-operational thermostatic controls combined with the excessive heat from the boiler. Nonetheless, Kennedy failed to take remedial measures or alert prison officials.

148.   Mr. Rutledge's death of hyperthermia was the direct and proximate result of Defendant Kennedy's deliberate indifference or malice to conditions of confinement amounting to cruel and unusual punishment.

**Third Cause of Action: Wrongful Death; Individual Capacity Supervisory Liability; Deliberate Indifference; Eighth Amendment via §1983; Policy and/or Custom and/or Failure to Train – Defendants Warden Phyllis Morgan and Warden Kenneth Peters.**

149.   As stated above, Mr. Rutledge was not the first to die as a result of excessive heat from the boiler on T unit. The circumstances of an earlier death, similar to the circumstances that led to Mr. Rutledge's death, were generally known to individuals working at the prison, including each of the named defendants.

150.   Based on the history of inmate death and/or injury resulting from past "major dysfunction" of the boiler at Donaldson in T housing dorm, and based on the obvious and known risk of substantial harm to inmates from excessive heat as recognized by

Defendant's own "Psychotropic Medication and Heat" policy, prison officials, including Defendants Warden Phyllis Morgan and Warden Kenneth Peters, were aware of the need to train corrections officers to perform year round temperature checks, not just during periods of time when the outside temperature exceeds 85 degrees, and of the need for special means to promote cooling any time when the temperature of a housing unit rises over 85 degrees, not just during times when the outside temperature reaches that threshold.

151.   However, Defendants' "Psychotropic Medication and Heat" Policy arguably only requires temperature checks and special means to promote cooling during times when the outside temperature is over 85 degrees. Defendants therefore have an official policy, practice, or custom of <u>not</u> requiring temperature checks or special means to promote cooling during times when the outside temperature is below eight-five degrees, even if the inside temperature is above eighty-five degrees.

152.   Defendants Warden Phyllis Morgan and Warden Kenneth Peters had authority to institute policies, procedures, or practices requiring corrections officers to institute special means to promote cooling for inmates at risk of serious injury or harm from excessive heat when temperature on a housing unit exceeds 85 degrees, regardless of the outside temperature. Defendants Warden Phyllis Morgan and Warden Kenneth Peters had the authority to require training for corrections officers

of the need to institute special means to promote cooling whenever the temperature in a housing unit exceeds 85 degrees, regardless of the outside temperature.

153.   Defendants Warden Phyllis Morgan and Warden Kenneth Peters were further aware that temperatures in T unit regularly exceeded 85 degrees when the boiler was running in the wintertime. Defendants Warden Phyllis Morgan and Warden Kenneth Peters were aware that Defendant's own policies identify exposure to such temperatures as potentially life threatening for certain categories of inmates, for instance inmates taking psychotropic medications as identified in Defendant's "Psychotropic Medication and Heat" Policy.

154.   However, despite the obvious and known risk of substantial harm to inmates from excessive heat as recognized by Defendant's own "Psychotropic Medication and Heat" Policy, Defendants Warden Phyllis Morgan and Warden Kenneth Peters failed to institute policies or practices requiring corrections officers to institute special means to promote cooling for inmates at risk of serious injury or harm from excessive heat when temperature on a housing unit exceeds 85 degrees, regardless of the outside temperature. The failure to institute such policies constitutes deliberate indifference to the obvious need of inmates to be free of life-threatening excessive heat, as recognized by Defendant's own "Psychotropic Medication and Heat" policy. Instead, Defendant has an official policy, custom, or practice of not requiring temperature checks or special means to promote cooling during times when the

49

outside temperature is below eight-five degrees, even if the inside temperature is above eighty-five degrees.

155. Moreover, despite the obvious and known risk of substantial harm to inmates from excessive heat as recognized by Defendant's own "Psychotropic Medication and Heat" Policy, Defendants Warden Phyllis Morgan and Warden Kenneth Peters failed to require training for corrections officers of the need to institute special means to promote cooling whenever the temperature in a housing unit exceeds 85 degrees, regardless of the outside temperature. The failure to require such training constitutes deliberate indifference to the obvious need of inmates to be free of life-threatening excessive heat, as recognized by Defendant's own "Psychotropic Medication and Heat" policy.

156. These Defendants' deliberate indifference, resulting in unconstitutional policies, customs, or practice, and the failure to institute appropriate policies and/or the failure to train corrections officers regarding the need for temperature checks and protective measures, was the direct and proximate cause of Mr. Rutledge's death constituting cruel and unusual punishment in violation of the Eighth Amendment.

157. Mr. Rutledge's death of hyperthermia was the direct and proximate result of these defendants' deliberate indifference or malice in regard to conditions of confinement amounting to cruel and unusual punishment in violation of the Eighth Amendment.

**Fourth Cause of Action: Wrongful Death; Alabama Code 6-5-410 – Defendants P & M Mechanical, Inc., Taylor Electrical Contractors, Inc., LS&R LLC, Automated Logic Corporation, and Fictitious Defendants ("Contractor Defendants")**

158.   This is a claim brought pursuant to 6-5-410 of the Code of Alabama for the wrongful death of Tommy Rutledge against the Contractor Defendants.

159.   Rutledge died on December 7, 2020, at the age of 44 years.

160.   The Contractor Defendants' employees, agents and subcontractors actions were negligent, careless, unskillful, reckless, willful and /or wanton.

161.   These acts and failures to act resulted in Rutledge's wrongful death.

162.   The direct proximate cause of Rutledge's death was the Contractor Defendants' negligent, wanton or willful acts and omissions.

   a.      **Negligence of the Contractor Defendants Caused Rutledge's Death**

163.   The Contractor Defendants had a duty to perform their work under the HVAC renovation to properly construct, design, supervise, repair, replace, install, inspect, maintain, and/or the like, their work on the heating and cooling systems equipment contained in the S / T control room without creating unsafe conditions for individuals in T unit.

164.   The Contractor Defendants breached that duty when they caused or allowed an unsafe and hazardous condition relating to the thermostatic controls, solenoids, and/or other heating and cooling control equipment for T unit located in or around the S / T mechanical control room.

165.   The Contractor Defendants failed to warn of the hazardous condition.

166.   As a direct and proximate cause of the negligent acts of the Contractor Defendants, the decedent, Thomas Rutledge, was deprived of his life,

**b.      Wanton and Reckless Misconduct of the Contractor Defendants Caused Rutledge's Death**

167.   The Contractor Defendants had a duty to perform their work under the HVAC renovation to properly construct, design, supervise, repair, replace, install, inspect, maintain, and/or the like, their work on the heating and cooling systems equipment contained in the S / T control room without creating unsafe conditions.

168.   The Contractor Defendants wantonly or recklessly breached that duty when they caused or allowed an unsafe and hazardous condition relating to the thermostatic controls, solenoids, and/or other heating and cooling control equipment for T unit located in or around the S / T mechanical control room. The Contractor Defendants failed to warn of the hazardous condition.

169.   As a direct and proximate cause of the wanton or reckless acts of these Defendants, the decedent, Thomas Rutledge, was deprived of his life.

**c.      Negligent and/or Wanton Hiring, Training and Supervision / Respondeat Superior**

170.   The Contractor Defendants are responsible for the actions of their employees, agents and subcontractors under respondeant superior.

171.   The Contractor Defendants are also responsible themselves for negligently training and supervising their employees, agents and subcontractors.

172.   At all times relevant to this action, the Contractor Defendants had the authority and duty to properly hire, train, subcontract, and/or supervise its employees and/or agents and/or subcontractors to properly construct, design, supervise, repair, replace, install, inspect, maintain, and/or the like, their work on the heating and cooling systems equipment contained in the S / T control room without creating unsafe conditions.

173.   At all times relevant to this action, the Contractor Defendants negligently, wantonly and/or recklessly exercised or failed to exercise said supervisory control and said negligent, wanton and/or reckless conduct was a proximate cause of the decedent, Thomas Rutledge, being deprived of his life.

## Fifth Cause of Action: Wrongful Death; Alabama Code 6-5-410 – Defendants ADCO Companies, Ltd. and Southeastern Temperature Controls Inc. d/b/a STC Worldwide, and Fictitious Defendants ("Boiler Maintenance Defendants")

174.   This is a claim brought pursuant to 6-5-410 of the Code of Alabama for the wrongful death of Tommy Rutledge against the Boiler Maintenance Defendants.

175.   Rutledge died on December 7, 2020, at the age of 44 years.

176.   The Boiler Maintenance Defendants' employees, agents and subcontractors actions were negligent, careless, unskillful, reckless, willful and /or wanton.

177.   These acts and failures to act resulted in Rutledge's wrongful death.

178.    The direct proximate cause of Rutledge's death was the Boiler Maintenance Defendants' negligent, wanton or willful acts and omissions.

### a.    Negligence of the Boiler Maintenance Defendants Caused Rutledge's Death

179.    The Boiler Maintenance Defendants had a duty to perform their work under the HVAC renovation to properly construct, design, supervise, repair, replace, install, inspect, maintain, and/or the like, their work on the boiler heating equipment without creating unsafe conditions.

180.    The Boiler Maintenance Defendants breached that duty when they caused or allowed an unsafe and hazardous condition relating to the boiler heating equipment.

181.    The Boiler Maintenance Defendants failed to warn of the hazardous condition.

182.    As a direct and proximate cause of the negligent acts of the Boiler Maintenance Defendants, the decedent, Thomas Rutledge, was deprived of his life,

### b.    Wanton and Reckless Misconduct of the Boiler Maintenance Defendants Caused Rutledge's Death

183.    The Boiler Maintenance Defendants had a duty to perform their work on the boiler heating equipment without creating unsafe conditions.

184.    The Boiler Maintenance Defendants wantonly or recklessly breached that duty when they caused or allowed an unsafe and hazardous condition relating to the boiler heating equipment.

185.    The Boiler Maintenance Defendants failed to warn of the hazardous condition.

186.  As a direct and proximate cause of the wanton or reckless acts of these Defendants, the decedent, Thomas Rutledge, was deprived of his life.

### c.   Negligent and/or Wanton Hiring, Training and Supervision / Respondeat Superior

187.  The Boiler Maintenance Defendants are responsible for the actions of their employees, agents and subcontractors under respondeant superior.

188.  The Boiler Maintenance Defendants are also responsible themselves for negligently training and supervising their employees, agents and subcontractors.

189.  At all times relevant to this action, the Boiler Maintenance Defendants had the authority and duty to properly hire, train, subcontract, and/or supervise its employees and/or agents and/or subcontractors to properly construct, design, supervise, repair, replace, install, inspect, maintain, and/or the like, their work on the boiler heating equipment without creating unsafe conditions.

190.  At all times relevant to this action, the Boiler Maintenance Defendants negligently, wantonly and/or recklessly exercised or failed to exercise said supervisory control and said negligent, wanton and/or reckless conduct was a proximate cause of the decedent, Thomas Rutledge, being deprived of his life.

## VIII.  Request for Relief

Plaintiff seeks the following relief:

191.  Award judgment in her favor against Defendants jointly and severally in an amount to be determined by the jury for compensatory damages;

192.   Award punitive damages against Defendants sufficient to punish them and to deter further wrongdoing;

193.   Award Plaintiff reasonable attorney's fees and costs pursuant to 42 USC §1988;

194.   Award Plaintiff all litigation expenses, costs, and pre-judgment and post-judgment interest at the maximum daily interest rate allowable by law; and

195.   Such other relief as the Court deems just and proper.

## VIII.  Jury Demand

196.   The Plaintiff demands a trial by struck jury on all issues so triable.

Respectfully submitted,

*/s/ Jon C. Goldfarb*
Jon C. Goldfarb asb-5401-f58j
L. William Smith asb 8660-a61s
Christina M. Malmat asb-1214-y44q
Lieselotte Carmen-Burks asb-8304-t46e
Counsel for Plaintiff

**OF COUNSEL:**
Wiggins, Childs, Pantazis, Fisher,
& Goldfarb, LLC
301 19th Street North
Birmingham, AL 35203
Telephone No.: (205) 314-0500
Facsimile No.: (205) 254-1500

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record. I further certify that the following will be served via certified mail with summons from the Court:

PLANT MAINTENANCE SUPERVISOR III BILLY KENNEDY
███████████

P&M MECHANICAL, INC.
c/o Wideman, Amanda
325 North Carson Road
Birmingham, AL 35215

TAYLOR ELECTRICAL CONTRACTORS, INC.
c/o Taylor, Joseph Bruce
5479 Skyland BLVD EAST STE 1
Cottondale, AL 35453

LS&R LLC
c/o Langston, Samuel H.
5345 Greathouse Road
Dora, AL 35062

AUTOMATED LOGIC CORPORATION
c/o United Agent Group, Inc.
4000 Eagle Point Corporate Drive
Birmingham, AL 35242

ADCO COMPANIES, LTD.
c/o ADCO Companies Inc.
3657 Pine Lane
Bessemer, AL 35023

SOUTHEASTERN     TEMPERATURE     CONTROLS     INC.     d/b/a     STC
WORLDWIDE
c/o Kornowicz, Brian
4908 Cox Cove
Helena, AL 35080

On this day the 14 of October, 2022.

> */s/ L. William Smith*
> Of  Counsel