## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **LAVENTRA DENICE RUTLEDGE,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  2:21-cv-00226-RDP** |
| | } | |
| **CHRISTIE SANSING, et al.,** | } | |
| | } | |
| **Defendants.** | } | |

## MEMORANDUM OPINION

This matter is before the court on the four motions for summary judgment filed by various defendants in this case. (Docs. # 181; 183; 184; 185). The Motions have been fully briefed and are ripe for review. (Docs. # 181; 183-190; 192; 197; 199; 202-204; 206-207). For the reasons discussed below, the motions are due to be granted in part and denied in part as discussed in more detail below.

## I.     BACKGROUND[1]

This case stems from the tragic death of Thomas Lee Rutledge ("Rutledge") on December 7, 2020, which was the result of uncontrolled heating from the prison's boiler room which led to hyperthermia. (Docs. # 132 ¶ 113; 182-7; 182-45, p. 209:1-8). Rutledge was an inmate of the Alabama Department of Corrections ("ADOC") and housed at William E. Donaldson Correctional Facility ("Donaldson") in Bessemer, Alabama. (Doc. # 132). Rutledge had been incarcerated since 1995 for Capital Murder and Robbery I. (Doc. # 182-2). Plaintiff LaVentra Denice Rutledge

---

[1] The facts set out in this section are gleaned from the parties' submissions and the court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party, although factual disputes are acknowledged. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the facts that could be established through live testimony at trial. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

("Plaintiff") brings this cause of action under 42 U.S.C. § 1983 as the administratrix of her brother's estate. (Doc. # 132).[2] Plaintiff claims that Defendants were deliberately indifferent to Rutledge's conditions of confinement in violation of the Eighth Amendment. (*Id.*). The facts below are relevant to the motions pending before the court.

### A.    The Defendants

Plaintiff originally named seventeen Defendants in this action. In November 2022, Plaintiff voluntarily dismissed four of them, leaving fourteen Defendants in this case. (Docs. # 100, 111, 120, 130, 131). Out of the remaining Defendants, seven of them are affected by the motions currently pending before the court: Billy Kennedy, Charles Dean, Geoffrey Griffin, John Rodgers (collectively with Dean and Griffin, the "Correctional Officers"), Kristi[3] Sansing, Warden Kenneth Peters, Warden Phyllis Morgan (who collectively with Warden Peters is referred to as the "Correctional Wardens").

Defendant Billy Kennedy has spent his entire maintenance career at Donaldson. (Doc. # 182-45, pp. 15:1-17, 16:8-10). During 2020, Kennedy worked as Plant Maintenance Supervisor II for Donaldson. (Docs. # 182-27, pp. 166:19-167:1; 182-45, p. 14:21-23). In this role, he was responsible for "overseeing the maintenance operation of the institution," including the heating ventilation and air conditioning ("HVAC") systems. (Docs. # 182-46; 182-45, pp. 22:7-23:1). Kennedy remained on-call for maintenance issues at Donaldson even when he was not present at the prison. (Doc. # 182-45, p. 117:4-23). When dealing with an issue relating to the boiler heating systems, Kennedy would consult Bert Teel – a Plant Maintenance Supervisor III based in Wetumpka, Alabama. (Doc.

---

[2] Plaintiff filed her initial complaint on February 12, 2021. (Doc. # 1). Since then, Plaintiff has filed four amended complaints. The operative current complaint is Plaintiff's Fourth Amended Complaint ("Complaint"). (Doc. # 132).

[3] Sansing has been incorrectly listed as "Christie" in previous filings.

# 197-8, pp. 16:5-17:3). Teel had responsibilities across all twenty-six prisons in Alabama, and only was involved in issues at Donaldson when that facility requested his assistance. (Doc. 197-8, p. 25:2-17). Teel, who previously worked with Kennedy, testified that Kennedy was not always truthful about the state of the maintenance equipment. (*Id.* at p. 46:10-19). At all relevant times, Kennedy was supervised by Warden Phyllis Morgan. (Doc. # 182-45, pp. 26:4-27:21). Kennedy was aware that inmates who take psychotropic medications have a special vulnerability to heat and that the T Unit housed inmates for whom climate control was necessary. (*Id.* at pp. 183:22-184:21). Kennedy was also aware that correctional officers regularly took temperature checks of the individual cells. (*Id.* at pp. 48:23-49:15, 99:9-15).

Defendant Charles Dean worked as a correctional officer at Donaldson in 2020. (Doc. # 182-34, pp. 12:14-13:1). Between 2010 and 2019, Dean was recorded to have received annual training on mental health and inmates with mental illnesses (Doc. # 182-18), but the parties dispute whether this training was actually provided (*see* Doc. # 182-34, 45:14-46:5). While Dean rarely worked in the Residential Treatment Unit ("RTU") where Plaintiff was housed, he was aware that inmates taking certain medication face an elevated risk of heat-related complications. (Docs. # 182-34, pp. 25:9-12, 66:5-22; 197-16). Dean testified that, to conduct a living and breathing check, he would tap on the door and get a verbal response from the inmate. (Doc. # 182-34, pp. 36:17-37:10). He also testified that, while working in the RTU, he performed temperature checks every thirty minutes to an hour and would contact his supervisor if temperatures were higher than 85°F. (Doc. # 182-34, p. 66:17-22). The parties dispute whether he actually performed these temperature checks. (*See* Doc. # 197-7).

Defendant Geoffrey Griffin worked as a correctional officer at Donaldson in 2020, but he was not permanently assigned to the RTU. (Doc. # 182-36, pp. 11:15-20, 14:15-23). Between 2015 and 2020, Griffin is recorded to have received annual mental health training (Doc. # 182-19), but

the parties dispute whether he actually received this training. (*See* Doc. # 182-36, p. 36:5-20). In December 2020, Griffin understood that ADOC policy required correctional officers to monitor and document temperatures inside the cells in the RTU, and that these temperature checks were required year-round. (*Id.* at pp. 39:21-40:6, 62:13-65:23). Griffin was aware that inmates receiving psychotropic medications face an increased risk of developing heat-related complications. (*Id.* at pp. 62:13-65:23). Other than offering ice, Griffin claimed he was not trained about what to do if inmates complained about the heat. (*Id.* at pp. 77:18-78:1).

Defendant John Rodgers worked as a correctional officer at Donaldson in December 2020 and was permanently assigned to the RTU at all relevant times. (Doc. # 182-38, pp. 20:2-21, 23:20-24:8, 29:9-16). From 2009 until 2020, Rodgers received annual specialized training to work in the mental health units at Donaldson, including specific training on inmates that were more susceptible to heat-related medical complications (like those taking psychotropic medication). (*Id.* at pp. 20:22-21:3, 158:5-159:15; Doc. # 182-20). Rodgers understood that correctional officers for the RTU were to perform living and breathing checks three times per shift and were to notify a supervisor if an inmate did not respond. (*Id.* at pp. 77:12-78:23, 79:1-7). Rodgers also understood that he was to conduct security checks in the RTU every thirty minutes, during which he would ensure that all doors and windows were secured, tray doors were closed (unless there was a legitimate reason for them to be open), and each inmate was in the appropriate cell. (*Id.* at pp. 92:21-93:7; 246:20-247:7). Rodgers was also aware that officers were to record the temperatures of the cells in the RTU year-round. (*Id.* at pp. 156:19-157:9). If inmates were exposed to excessive heat, Rodgers testified that officers were trained to open the tray doors, notify supervisors, ensure inmates received additional ice, and if the issue persisted, allow the inmates extra showers. (*Id.* at pp. 188:5-189:9). According to Rodgers, he checked cell temperatures as a rover officer by opening the tray door to an individual cell and directed the infrared beam into the cell. (*Id.* at p. 63:17-21, 62:14-63:21, 74:6-9, 130:1-18).

Rodgers never took temperature readings from the cube office, nor did he take temperatures by shooting the temperature gun through the "communication tube" in the cube office. (Doc. # 182-38, p. 48:1-6, 60:15-18).

Defendant Kristi Sansing worked as a correctional officer at Donaldson in 2020. (Doc. # 182-43, pp. 84:2-85:4). She also served as a cube officer, which involved monitoring the work of the correctional officers in the R, S, T, and U Units, and logging their reports into the Duty Post Log; filling out the Equipment Log for the R, S, T, and U Units; recording when inmates showered; and periodically recording temperature readings near the cube office. (Docs. # 186-1; 186-2, pp. 16:4-9, 20:20-21:1, 63:7-64:9, 68:21-69:22). No cube officer, including Sansing, was allowed to leave the cube office while on a shift. (Docs. # 186-1; 186-2, pp. 18:13-19:3, 27:14, 221:2-9; 186-4, pp. 248:15-249:4; 182-43, pp. 18:13-19:3; 182-42;182-34, pp. 37:20-38:8). Sansing was not a permanent mental health correctional officer, nor was she trained as one. (Doc. # 186-2, pp. 219:6-221:1). She was aware, however, that the R, S, T, and U Units housed mentally ill inmates. (Doc. # 182-43, p. 215:2-7). She understood that correctional officers were required to monitor and record the temperature of the cells year-round and that inmates taking psychotropic medication face an increased risk for heat-related complications. (*Id.* at p. 171:1-23). However, Sansing claims she did not receive any training regarding the susceptibility that inmates taking psychotropic medications may have to heat-related illness. (*Id*. at pp. 171:4-21, 209:23-210:5). Sansing claims she never read the warning on the temperature logs, for if she had, she would have instructed rover officers to check the temperature inside every cell. (*Id.* at pp. 210:11-23, 93:1-3, 160:10-13). Records indicate that Sansing received mental health training related to inmates with mental illnesses. (Doc. # 182-21). When recording temperatures, Sansing testified that she was trained to aim the temperature gun through the "communication tube" in the cube office and measure the temperature of the day room. (Docs. # 186-1; 186-2, pp. 17:19-22, 20:7-21:1, 25:18-26:7, 82:3-9). When recording temperatures

in the logs, Sansing would randomly select a cell number and record the day room temperature for that cell, knowing that the temperature log may not accurately reflect the temperature of the specific cell listed. (*Id.* at pp. 87:21-88:4, 88:13-20). There was no way for Sansing to take the temperature of Rutledge's cell, or any other cell, from the cube office. (Docs. # 182-43, p. 26:12-19; 182-23, p. 108:21-109:8). Sansing was the only correctional officer who would take temperatures from the cube office. (Doc. # 186-9, p. 32:5-19). She testified that she understood that by writing down those numbers she was falsifying the temperature logs. (Doc. # 182-43, pp. 89:1-3, 91:16-92:9, 93:21-94:23, 160:10-13, 202:4-203:21).

Warden Peters began his career with ADOC in 1990 and was eventually promoted to Warden III,[4] a role he held from May 2020 through July 2021. (Doc. # 182-23, pp. 15:22-16:5, 18:1-2, 19:18-21, 20:22, 21:10-11). As Warden III, Peters reported to Edward Ellington, ADOC's Regional Director for the region that covers Donaldson. (*Id.* at p.21:13-17). Warden Peters was responsible for: the operation of Donaldson; implementation of ADOC and Donaldson policies and procedures; and "providing adequate security staffing for the mental health units." (*Id.* at p. 20:22-23, 24:6-22, 25:18-21, 245:22-246:4; Docs. # 182-25; 182-49). According to Warden Peters, he (1) ensured all shift commanders and supervisors received Standard Operating Procedures, (2) relied on the shift commanders and supervisors to ensure that correctional officers received proper training related to temperature checks and maintaining temperature logs year-round in the mental health units, and (3) ensured that all shift commanders understood the importance of recording temperature checks along with the effects of heat on inmates taking psychotropic medication. (*Id.* at pp. 63:5-8, 64:11-16, 69:1-70:6). The parties dispute whether Warden Peters actually fulfilled these responsibilities. (*See id.* at pp. 64:11-65:22, 71:13-18, 189:15-19).

---

[4] ADOC classifies the Warden position as follows: Warden I, II, and III; Warden III being the highest rank. (Doc. # 182-23, p. 13:10-14:4).

Warden Morgan began her career with ADOC in 1986 and was eventually promoted to Warden II, a role she held from May 2020 through December 2020. (Doc. # 182-27, pp. 10:10-21, 11:16-18, 12:8-21, 14:5-13, 114:9-14). As Warden II, Warden Morgan oversaw three correctional captains and provided oversight for the Restricted Housing Units ("RHU") and the mental health units (R, S, T, U, V, and W). (*Id.* at pp. 13:22-14:13, 14:9-13, 18:2-19:14, 24:11-25:6). As part of her responsibilities, Warden Morgan reviewed Administrative Regulation ("AR") 619 and understood that inmates who take psychotropic medication may face an increased risk of heat-related medical issues. (*Id.* at pp. 75:1-7, 78:1-6). However, when asked, Warden Morgan could not answer whether the policy permitted inmates to be exposed to sustained elevated ambient temperatures when the outside temperature is below 85°F. (Doc. # 182-27, pp. 92:6-95:2; 197:13-198:3).

The Correctional Wardens distributed ARs to all supervisors (*i.e.,* captains, lieutenants, and sergeants), required each supervisor to sign off acknowledging they had read and understood the policy, and relied on these supervisors to disseminate the policies to security staff and see to it that the staff read and understood the policies. (*Id.* at p. 76:5-15, 100:14-101:5). The parties dispute whether the Correctional Wardens actually fulfilled this responsibility. (*See* Docs. # 182-23, pp. 73:3-14; 182-27, pp. 96:7-97:23). The Correctional Wardens circulated periodic reminders to staff in the mental health units to check the temperature in the units. (Doc. # 182-27, p. 77:9-12).

### B.    The Residential Treatment Unit at Donaldson

Pursuant to the ADOC and Donaldson policies in place at the relevant time, inmates who entered a facility were evaluated by a mental health provider and assigned a mental health code to determine whether they required placement in a designated unit. (Docs. # 182-54; 182-25). Inmates who suffered from serious mental illness were housed in the RTU. (Docs. # 182-23, p. 25:4-13; 182-25; 182-27, pp. 69:17-70:21). At all times relevant, the RTU included the R, S, T, and U Units. (Doc. # 182-23, p. 25:3-13).

7

After being diagnosed with schizoaffective disorder in 2015, Rutledge was assigned the code "MH-D," and based on the recommendation of mental health staff, was placed in cell T13-1A in Donaldson's T Unit. (*Id.*; Docs. # 182-3; 182-6; 182-7). The code "MH-D" was used for "Residential" inmates who were "receiving chronic or acute mental health services and requiring placement in a specialized housing unit." (Docs. # 190; 182-6). The Correctional Wardens and Correctional Officers cited the Mental Health Coding and Tracking of Inmates (Doc. # 182-54) to support this designation. While Plaintiff does not dispute it, the court notes that this document does not include the language cited by the parties.  Before his death, Rutledge was taking psychotropic medication, which increased his chance of heat-related illness. (Docs. # 197-2, pp. 2-4; 182-29; 197-4).

Inmates in the RTU remained in their cells for the majority of each day, received meals in their cells, and had access to a sink and toilet. (Docs. # 182-36, p. 20:4-20; 182-23, p. 96:5-10). Most inmates were not continuously confined to their cells. Those in the RTU were generally able to leave their cells for medical appointments and other treatments as well as go outside for recreation. (Doc. # 186-4, pp. 156:16-157:2). However, Rutledge did not leave his cell often, apparently due to his mental health issues. (Docs. # 182-43, p. 103:2-4; 186-9, pp. 41:4-42:11). Another inmate testified that Rutledge often had issues with his sink and his toilet. (Doc. # 197-21, pp. 10:22-11:16).

The cubicle office ("cube office") was located at the hub of the R, S, T, and U Units. (Docs. # 196-2; 186-2, pp. 23:6-19, 225:1-6, 228:1-4; 186-5, pp. 255:23-256:7). The cube office is an elevated observation room, which allows the officer on duty to look into each cell block day room. (*Id.*).

### 1.    Regulations and Procedures in the RTU

During 2020, ADOC instituted and enforced several Administrative Regulations ("ARs"), which governed the practices and procedures of the RTU. On August 24, 2020, ADOC instituted

AR 619. (Doc. # 182-29). AR 619 established "responsibilities, policies, and procedures necessary to recognize and prevent heat-related complications for all inmates, including those whose risk is elevated because they take psychotropic medication." (*Id.*).

Under AR 619, correctional officers were to take temperatures inside the cells and record them on temperature logs. (*Id.*). This was scheduled to occur three times daily. (*Id.*). The parties dispute whether these checks were conducted correctly. (Docs. # 182-15 - 182-17; 182-43, pp. 35:2-6, 184:9-12; 182-36, pp. 73:22-74:22). The method to measure the temperature of a cell involved use of an infrared thermometer ("temperature gun") to check the air temperature of a particular cell itself, rather than the surrounding areas. (Doc. # 182-45, pp. 37:10-18, 42:21-43:8). Each temperature log form included the following language:

> Inmates receiving psychotropic medication have an increased sensitivity to sunlight and are at higher risk for such heat induced syndromes as heat stroke, hyperthermia, and heat prostration when exposed to sustained elevated temperature. Temperature checks will be conducted year round in all Segregation Units and Mental Health Units.

(Doc. # 182-31). This warning accurately stated ADOC's policy and procedure. (Doc. # 182-23, p. 103:1-13).

Should temperatures reach 85ºF, officers were to notify the shift commander and the warden and provide extra means of cooling. (*Id.*). For example, officers were to ensure adequate hydration, ensure inmates received medical evaluation (if they suspected an inmate was experiencing heat-related complications), use fans to increase ventilation, provide fluids and ice on request, and allow additional showers to promote cooling. (*Id.*). If these efforts were insufficient, the warden was to consider authorizing temporarily moving inmates to a cooler area. (*Id.*).

To assist with ventilation, inmates could open a plexi-glass window to allow air from outside the facility into their cells. (Doc. # 182-23, pp. 49:5-7, 56:12-17). Inmates could not adjust the airflow of the heating vents in their cells, nor could they access thermostats from inside their cells.

(Docs. # 182-23, pp. 79:2-80:10; 182-27, pp. 138:6-14, 140:18-21). At times, to prevent heat from entering the cells, inmates would obstruct the vents; however, inmates were not supposed to do this. (*Id.*; Doc. # 182-23, p. 138:5-10).

Under the regulations and procedures, all personnel who interacted with inmates housed in the RTU were to receive specialized mental health training, regardless of their permanent assignment. (Doc. # 182-23, pp. 188:5-189:14). To implement these policies and procedures, wardens were to ensure that their staff understood and implemented appropriate protocols. (Doc. # 182-29). According to AR 608 and AR 619, staff members assigned to the RTU were to receive training regarding psychotropic medications and effective management techniques to utilize with inmates who had serious mental illnesses. (Docs. # 182-29; 182-53). The parties dispute whether this training was actually provided. (*See* Docs. # 182-34; 182-36; 182-43).

AR 633 established policies and procedures for training mental health, medical, and security staff (including correctional officers) on policies related to inmate mental health, the RTU, and the ADOC mental health ARs. (Doc. # 182-39). AR 616 required training for security and clinical staff in recognizing certain side effects that may occur with psychotropic medication, how to recognize signs of heat adversely affecting inmates taking psychotropic medications, and how to respond when that became an issue. (Docs. # 182-55; 182-29). The parties also dispute whether this training was provided. (*See* Docs. # 182-34; 182-36; 182-43).

In addition to the ARs, Donaldson maintained certain Standard Operating Procedures ("SOPs"). For example, SOP 4-050 established the "responsibilities, policies, and procedures for Mental Health Units," and required the Mental Health Staff, correctional officers, and correctional cubicle officers ("cube officers") to receive specialized training in serious mental illnesses and the ADOC mental health regulations. (Doc. # 182-25).

Pursuant to SOP 4-050, correctional officers were required to conduct certain checks of the inmates in the RTU. Three times per shift, correctional officers were to conduct a living and breathing check of the entire unit, requiring the officer to get either a verbal response from the inmate or to observe the inmate up and moving around to ensure each inmate was alive and well. (*Id.*). Every thirty minutes, correctional officers were required to conduct an observation check of each inmate. (*Id.*). And every thirty to forty-five minutes, correctional officers were to conduct a security check to ensure all doors, windows, and tray hole doors were secured and that all inmates were in their assigned cells. (Doc. # 182-38, pp. 92:19-93:7).

SOP 4-009 required officers to conduct "pill calls," during which one officer escorted a member of the mental health staff to each cell. (Doc. # 182-24). The mental health staff member would ask each inmate to take their medication and record whether they refused or accepted. (*Id*) Under SOP 4-009, inmates were not allowed to shower without supervision, so officers would ask the inmates if they wanted to shower. (Doc. # 182-34, p. 39:2-16). Officers were to receive a response from each inmate and note of that response. (Doc. # 182-24). The parties dispute whether these protocols were correctly followed. (*See* Doc. # 186-9, p. 19:2-19).

### C. The Heating System and HVAC Renovation at Donaldson

At all relevant times, heating within Donaldson was generated by running hot water from a central boiler plant that sends the water through a continuously flowing heating loop, which in turn runs through heating coils located in or around the mechanical control rooms. (Doc. # 197-8, pp. 26:10-30:2, 50:12-51:7, 57:2-4). Because the boilers and inline pumps were used only for heating, they were deactivated in the summer and reactivated at the start of each cold season. (*Id.* at pp. 39:18-40:8). Kennedy was responsible for manually starting up the boilers during December 2020. (*Id.* at pp. 40:9-41:4). In the boiler room, a steam control valve (which is also called a pressure relief valve ("PRV")), if working correctly, automatically controlled the level of heat delivered to the non-

11

thermostatically controlled units. (*Id.* at pp. 31:1-32:20). When the water inside the tube reached a certain temperature, then the PRV was designed to turn off. (*Id.* at p. 32:2-7). Kennedy testified that the boiler room PRV served as a failsafe – *i.e.,* it was supposed to prevent the heating water loop from getting too hot; however, if the PRV was not functioning properly, the heating loop water temperature could rise to dangerous levels. (Docs. # 182-45, p. 178:13-14; 197-8, pp. 32:21-33:6, 34:1-5). The record evidence indicates the heating system at Donaldson still functions in this manner.

Most of Donaldson, except Units R, S, T, U, V, W, X, and Y, lacks air conditioning and thermostatic controls. (Docs. # 197-8, pp. 30:13-19, 73:10-16; 182-45, pp. 132:17-133:21). In December 2020, Kennedy was responsible for regulating and monitoring temperatures in those units. (Doc. # 138). During 2020, Kennedy monitored and recorded the temperature of the boiler heating water loop twice daily, and tried to keep the heating water loop temperature between 112°F to 120°F, with the maximum temperature not to exceed138°F. (Docs. # 182-45, pp. 73:2-9, 108:8-17; 132).

When the boiler plant is active, the temperature is determined by the heat of the water in the loop, which is monitored and controlled from the boiler room. (Docs. # 197-8, pp. 30:13-19, 73:10-16; 182-45, pp. 132:17-133:21). Kennedy was aware that regulating the temperature of the non-air-conditioned areas of the prison required constantly monitoring the temperature of the water in the loop. (Doc. # 182-45, p. 133:12-21).

### 1.      The HVAC Renovation Project

In October 2018, ADOC entered into a contract with Defendant P&M Mechanical, Inc. ("P&M") and Borden Morris Garner Consulting Engineers ("Morris Engineers"). (Doc. # 182-9). The contract was for renovations to the HVAC system in Donaldson's R, S, U, V, W, X, and Y Units ("HVAC Project"). (*Id.*). The HVAC Project was completed on August 24, 2020. (Doc. # 182-10). In addition to P&M and Morris Engineers, various subcontractors, including Defendants Taylor

Electrical Contractors, Inc. ("Taylor Electrical"), LS&R LLC, and Automated Logic Contracting Services, Inc. (collectively, the "Project Subcontractors") worked on the HVAC Project. (Docs. # 132; 138). The HVAC Project did not change the heating system at Donaldson, did not involve work on the HVAC system for T Unit, and was not supposed to affect the heating coils for T Unit. (Docs. # 182-13; 132; 138). Under SOP 5-027, "[t]he Plant Maintenance Supervisor II is responsible for overseeing the maintenance operation of the institution" and for providing the warden with a daily update on the jobs to be completed that day, as well as what jobs were ultimately completed. (Doc. # 182-46).

The S and T Units share a mechanical room located on the second floor between the two units ("S&T Mechanical Room"). (Doc. # 182-45, pp. 65:4-66:16, 67:12-18, 130:18-22). Part of the HVAC Project called for demolition of the HV-7 heating and ventilation system, coils, ductwork, and electrical controls in the S&T Mechanical Room. (Doc. # 182-12). While the old equipment had to be demolished and new equipment installed in the S Unit, the equipment for T Unit was to remain intact, both during and after the project. (Doc. # 182-45, pp. 83:18-85:10).

Before August 25, 2020, during the planned demolition in the S&T Mechanical Room, P&M and the Project Subcontractors damaged the thermostatic controls for T Unit. (Docs. # 182-45, pp. 65:11-20, 66:2-8, 68:7-12, 79:19-80:10, 88:3-19; 197-11; 197-12). This damage meant that, when hot water was supplied from the central boiler plant through the inline pumps, it would flow continuously through the heating coils and supply continuous, unregulated heat. (Doc. # 182-45, p. 68:7-21). Because there was no remote monitoring for the thermostatic controls of the T Unit, the climate conditions of T Unit could only be manually changed in the S&T Mechanical Room. (Doc. # 182-45, pp. 126:2-12, 126:23-128:10).

P&M and Taylor Electrical informed Kennedy that they caused the damage to the S&T Mechanical Room, which they last accessed around May 6, 2020. (Docs. # 182-45, pp. 66:2-8, 76:2-

7, 79:19-80:10, 88:3-19; 197-12; 182-50).

### 2.     Heating Issues at Donaldson

In November 2020, Warden Peters became aware of temperature issues throughout Donaldson, including reports of cold temperatures in the facility. (Doc. # 182-23, p. 81:1-15). On November 24, 2020, Warden Peters notified ADOC Regional Director Ellington that "Donaldson [would] not have heat until Monday" due to delays caused by the contractors addressing the issue. (Doc. # 182-30).

On November 30, 2020, STC Worldwide indicated to Donaldson's maintenance staff that as of that date the boilers were running on manual control. (Docs. # 197-9; 197-8, p. 112:23-113:8). Once the boilers were repaired, Kennedy visited each of the mechanical rooms and "[made] sure units [were] functioning properly and that the hot water [was] in fact circulating through there, as well as the inline thermometers in the new mechanical rooms." (Doc. # 182-45, p. 139:7-18; 197-9; 138).

Because the boiler system was being manually controlled, the maintenance staff was required to constantly monitor the temperature of the water loop to avoid overheating. (Doc. # 197-8, pp. 113:12-17, 126:18-23). When the prison became too hot, in order to manually control the system, Kennedy (or another authorized person) would go to the plant and turn off the manual control or turn the boiler off. (Docs. # 197-10; 197-8, p. 46:10-19). Constantly checking the inline water temperature when manual controls were implemented was important because the temperature in areas without thermostatic control -- such as the T Unit on December 7, 2020 -- was directly related to the temperature of the heating water loop. (Doc. # 197-8, pp. 66:22-67:20).

On December 2, 2020, Warden Peters emailed Ellington again, stating that "one of the two Donaldson Boilers has stopped working again last night/this morning and the other one is not working correctly." (Doc. # 182-30). That same day, Warden Peters emailed Ellington saying that

14

"the heat is back on" and that Kennedy "contact[ed] the Engineering division to have the contractor come back out and re-check the boilers" even though the boilers were functioning. (*Id.*). That same morning, Teel sent an email with details regarding the PRV, showing that the boilers were still being manually controlled. (Docs. # 197-10; 197-8, pp. 136:13-22, 138:14-23, 139:13-140:6). So, as of December 2, 2020, Kennedy was aware that the PRV was not functioning and the manual system required constant monitoring to avoid producing too much heat. (Doc. # 197-8, pp. 141:21-142:6, 144:9-12).

### D. December 5, 2020 through December 7, 2020

On December 5, 2020, Rodgers recorded the temperature in the T Unit as 74ºF, both at 4:00 a.m. and again at 5:00 a.m. (Docs. # 182-38, pp. 100:23-101:10, 104:5-106:12, 109:12-22; 182-40). However, Rodgers testified that he relied on the temperatures recorded by Sansing, who did not lease the cube office. (*Id.* at pp. 147:15-148:6).

In December 2020, Kennedy worked at Donaldson from 7:45 a.m. to 5:00 p.m. (Doc. # 182-45, pp. 58:10-59:23, 117:4-9). As part of his responsibilities, Kennedy recorded the temperature for the boiler water twice per day, and this included the days leading up to the incident. (Doc. # 182-45, p. 108:9-13). However, the logs for November 30, 2020 through December 7, 2020 were destroyed in a flood. (Doc. # 199).

On December 7, 2020 -- the day of the incident -- several correctional officials were on duty in the T Unit. The record indicates there are three shifts at Donaldson: (1) first shift, which began at 6:00 a.m. and ended at 2:00 p.m.; (2) second shift, which began at 2:00 p.m. and ended at 10:00 p.m.; and (3) third shift, which began at 10:00 p.m. and ended at 6:00 a.m. (Docs. # 182-41; 182-28). Warden Morgan worked at Donaldson from 1:30 p.m. until 10:00 p.m. (Doc. # 182-27, p. 24:15-17). On the day of the incident, Rodgers, Dean, and Griffin all worked as rover officers – *i.e.*, officers who physically roamed the day room area and outside of the cells, observing and assisting the

inmates. (Docs. # 182-38, p. 125:7-12; 182-28). Sansing worked the entire second shift as the cube officer for Units R, S, T and U, beginning at 2:00 p.m. on December 7, 2020 and worked into the third shift, leaving at 4:28 a.m. on December 8, 2020. (*Id.*; Docs. # 186-1; 186-3). Rodgers worked in the T Unit as a rover officer during the first and second shifts, and ended his workday around 5:30 p.m. (Doc. # 182-28). During his time, Rodgers performed security checks in the T Unit every hour until 4:35 p.m.; conducted living and breathing checks at 2:35 p.m., 4:05 p.m., and 5:05 p.m.; and reported all inmates were alive and well after each such check. (*Id.*; Doc. # 182-41). Rodgers did not perform any temperature checks in the RTU during this time period. (Docs. # 182-38, pp. 55:16-58:13, 72:11-21, 147:8-17, 148:3-10; 182-51; 182:31). At 5:35 p.m., Dean arrived for his shift in the T Unit to relieve Rodgers as the rover officer. (Doc. # 182-28). Dean performed security checks at 5:35 p.m. and 6:35 p.m.; performed living and breathing checks in T Unit at 6:05 p.m., 7:05 p.m., and 8:05 p.m.;[5] and reported that all units were secure, and all inmates were alive and well. (*Id.*; Doc. # 186-3). Griffin also worked as a rover officer during the second shift in the T Unit, and conducted a security check at 7:35 p.m., finding that all units were secure.[6] (*Id.*). During her time at work on December 7th and 8th, Sansing did not receive any reports of either a security issue or an issue with the inmates. (Docs. # 186-3;186-2, p. 197:7-20). So she logged that all ninety-six units were "alive and well" and "were secure." (*Id.*).

In addition to doing the security checks and the living and breathing checks, the correctional officers in the T Unit served meals at 3:33 a.m., 10:13 a.m., and 3:10 p.m. (Doc. # 186-3). The correctional officers in the T Unit also conducted pill call at 3:45 a.m., 9:55 a.m., and 2:35 p.m. (*Id.*;

---

[5] Sansing testified that she wrote "alive and well" in her cube log at the beginning of each living and breathing check, and thus these times may not accurately reflect when Dean concluded the living and breathing checks. (Doc. # 182-43, pp. 100:12-101:18).

[6] Griffin failed to recall if he noticed that the T Unit was hot that evening, and could not recall whether he checked on Rutledge at all on December 7, 2020. (Doc. # 182-36, pp. 73:19-21, 78:1-6, 78:7-20).

Doc. # 182-41). Rutledge received his medication, and showed no signs of distress. (Docs. # 182-28; 182-38, pp. 88:17-89:17, 90:16-21, 197:9-138:5). Dean and Griffin offered showers to inmates in the R, S, T, and U Units beginning at 6:34 p.m. and ending at 8:12 p.m. (Doc. # 182-28).

When the cells became heated, inmates were allowed the opportunity to take cold showers. (Doc. # 186-9, pp. 53:2-6, 139:2-4). On the night in question, Dean conducted the showers round for Units T and U while Griffin conducted those for Units R and S. (Doc. # 182-28). Rutledge's name was not on the list of those who took a shower. (*Id.*).

At 7:54 p.m., Dean conducted the second Institutional Bed Roster, during which inmates identified themselves to a rover officer by their name and number. (Docs. # 186-3; 186-8, pp. 32:4-7, 34:1-11, 89:12-18; 182-49).

Inmate Robert Jenkins was the inmate runner for T Unit during the second shift on December 7, 2020, which means he was permitted to leave his cell for designated shifts to check on fellow inmates and ask correctional officers for assistance. (Doc. # 186-2, p. 29:6-19). Around 5:00 p.m. to 6:00 p.m., Jenkins told Sansing that it was hot in the T Unit. (Docs. # 186-1; 186-2, pp. 26:9-37:1, 49:15-21, 186-9:6-9).[7] Sansing instructed Jenkins to distribute ice to his fellow inmates. (*Id.*).

On December 7, 2020, none of the officers reported excessive heat in T Unit nor that any complaints were made by inmates in T Unit. And, while Sansing entered temperature readings for the T Unit during the second and third shifts (Docs. # 182-31), it is disputed whether those temperatures were accurate (Doc. # 182-43, p. 80:5-23). In Sansing's Temperature Log for December 7, 2020, despite Jenkins's report that it was hot in the T Unit, the temperatures recorded were: 67°F at 5:00 p.m., 66°F at 6:00 p.m., 65°F at 7:00 p.m., 64°F at 8:00 p.m., 61°F at 9:00 p.m., and 86°F at 10:00 p.m. (Doc. # 186-6). However, because she falsified the temperature logs, Sansing

---

[7] Jenkins testified that on those occasions it became hot in his unit, he would go to his cell and get naked, and others did so, too. (Doc. # 186-9, p. 53:7-17).

did not actually know how hot it was in each cell (again, this was because she recorded the day room temperature), nor did she think it was important to know how hot it was in the cells. (Doc. # 182-43, pp. 58:18-20, 61:13-21).

Jenkins distributed ice from a cooler located in the RSTU day room. (Docs. # 186-2, p. 37:3-14; 186-9, p. 30:15-22). When Jenkins distributed ice to those on the upper tier, he could only carry one scoop of ice at a time up the stairs and then pour the ice through the tray door into a cup held by the inmates. (Docs. # 182-43, pp. 40:7-41:8; 186-9, pp. 30:15-31:18). Rutledge refused the ice Jenkins offered him. (Docs. # 186-2, p. 49:15-21; 186-9, pp. 23:4-11, 139:13-140:8). Sansing informed Dean that ice was distributed to inmates (although she did not record that in the cube office log). (Docs. # 186-2, pp. 53:7-54:5, 62:4-8; 182-43, pp. 42:10-12, 44:9-45:5).

### F.     Rutledge's Death

Around 8:15 p.m. on December 7, Jenkins alerted Sansing that Rutledge did not respond when his name was called, and Sansing called for assistance at 8:21 p.m. (Docs. # 182-33; 186-2, pp. 108:10-21, 111:17-112:1). Less than five minutes after his initial report, Jenkins returned to the cube office to tell Sansing that Rutledge appeared not to be breathing. (*Id.*).

At approximately 8:22 p.m.,[8] Officer Corey Eller entered the T Unit and proceeded to Rutledge's cell. (*Id.*). At 8:25 p.m.,[9] Lieutenant Timothy Pope arrived at Rutledge's cell and, along with Eller, observed Rutledge sitting on his bed unresponsive. (*Id.*). At 8:26 p.m., Lieutenant Pope requested a gurney and an automated external defibrillator ("AED") from medical staff. (*Id.*). At

---

[8] The Incident Report (Doc. # 182-33) states that Officer Eller entered the cell around 8:22 p.m., but Sansing's Duty Post Log (Doc. # 186-3) indicates Officer Eller entered the cell around 8:15 p.m. The parties have not addressed this disparity.

[9] The Incident Report (Doc. # 182-33) states that Lieutenant Pope entered the cell around 8:25 p.m., but Sansing's Duty Post Log (Doc. # 186-3) indicates Lieutenant Pope entered the cell around 8:15 p.m. Again, the parties have not addressed this difference.

around 8:28 p.m., medical staff began CPR on Rutledge. (*Id.*). Nurse Mary Kringle wrote in her notes that Rutledge was found leaning against the wall with no spontaneous respiration or heartbeat. (Doc. # 197-2). Nurse Kringle also testified that it felt like an oven walking into Rutledge's cell and that she could feel the heat from the top of the stairs. (Doc. # 197-1, pp. 27:12-28:17).

Warden Morgan was notified of the incident, walked directly to T Unit, and watched as medical staff attempted to revive Rutledge in his cell. (Doc. # 182-27, pp. 58:19-23, 59:1-23). Warden Morgan then called Warden Peters and advised him of the incident. (Doc. # 182-23). Warden Peters arrived at Donaldson within ten minutes of receiving the call and went directly to T Unit. (*Id.* at pp. 36:22-37:2, 39:8-13). When Warden Peters arrived, Warden Morgan and Lieutenant Pope stood outside Rutledge's cell while medical staff attempted to perform life-saving measures on Rutledge inside his cell. (*Id.* at pp. 39:17-40:17). Warden Peters testified that it felt hot when he entered Rutledge's cell. (*Id.* at p. 41:17-19). Rutledge was transported to the health care unit at around 8:56 p.m.[10] (*Id.*; Doc. # 182-33). Medical staff attempted to revive him until approximately 9:23 p.m., but he remained unresponsive. (Doc. # 182-33). Thereafter, Dr. Walter Wilson pronounced Rutledge deceased.[11] (*Id.*).

The Medical Examiner reported that the temperature of Rutledge's cell and the cells nearby measured between 101ºF and 104ºF. (Doc. # 186-10; 197-7). He also reported that Rutledge died of hyperthermia with a core body temperature of 109ºF. (Doc. # 186-10).

---

[10] The Incident Report (Doc. # 182-33) shows Rutledge being transported from his cell at around 8:56 p.m., but Sansing's Duty Post Log (Doc. # 186-3) states Rutledge was transported around 8:35 p.m. The parties have not addressed this difference.

[11] The Rule 56 record is inconsistent regarding Rutledge's time of death. The incident report (Doc. # 182-33) indicates that Rutledge was pronounced deceased at 9:23 p.m. However, Sansing wrote in her Duty Post Log that Rutledge was deceased as of 8:35 p.m. (Doc. # 182-28).

Before this incident, in their time working at Donaldson, neither Warden Peters, Warden Morgan, nor Sansing possessed knowledge of any similar heat-related deaths or medical issues for inmates taking psychotropic medications. (Docs. # 182-23, pp. 125:15-127:10; 182-27, pp. 78:14-79:18; 186-1).

Following Rutledge's death, two emails were sent that referred to the incident. On December 7, 2020, Ruth Naglich, ADOC's Associate Commissioner of Health Services at the time, sent an email to various members of the ADOC executive staff, requesting an urgent temperature check in T Unit at Donaldson. (Doc. # 182-26). In her email, Naglich referenced a prior incident that involved "a major dysfunction of the boiler at Donaldson in T housing dorm, which lead to a fatal case." (*Id.*). On the morning of December 8, 2020, Deb Crook, who was then Director of Mental Health Services, sent a similar email referring to a death "several years ago" at Donaldson in the T Unit due to heat exposure. (Doc. # 182-57).

Kennedy testified that, on December 8, 2020, he went to the S&T Mechanical Room where he noticed the thermostatic controls on the wall had been destroyed and were laying on the floor. (Doc. # 185-42, pp. 65:11-20, 71:10-72:10). Kennedy testified that it was because of this damage that he did not have the ability to control the temperature in the T Unit from the S&T Mechanical Room. (*Id.* at p. 72:11-17). Kennedy also confirmed that the solenoids that controlled the PRV had been damaged and because of this, the heat was unregulated. (*Id.* at p. 68:7-12).

Ultimately, ADOC's Law Enforcement Services Division investigated Rutledge's death. (Doc. # 182-23, p. 124:17-21). During that investigation, Kennedy reported that, to his understanding, inmates had complained of heat the entire weekend of Rutledge's death. (Doc. # 197-5).

G.     **Procedural History**

The court ordered the parties to conduct limited discovery on the issue of qualified immunity. (Doc. # 159). The summary judgment motions now before the court are solely directed at the issue of qualified immunity. (*See* Doc. # 168). The Correctional Wardens (Doc. # 181), the Correctional Officers (Doc. # 183), Sansing (Doc. # 184), and Kennedy (Doc. # 185) have all asserted they are entitled to summary judgment on their qualified immunity defenses.

## II.     LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. Once the moving party has met its burden, Rule 56 requires the non-moving party to go beyond the pleadings and -- by pointing to affidavits, depositions, answers to interrogatories, and/or admissions on file -- designate specific facts showing that there is a genuine issue for trial. *Id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Allen v. Bd. of Pub. Educ. for Bibb Cty.*, 495 F.3d 1306, 1314 (11th Cir. 2007); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

When faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997). As *Anderson* teaches, under Rule 56(c), a plaintiff may not simply rest on the allegations made in the complaint; instead, as the party bearing the burden of proof at trial, he must come forward with at least some evidence to support each element essential to his case at trial. 477 U.S. at 248, 252 ("[A] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.'") (citations omitted).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." *Sawyer v. Sw. Airlines Co.*, 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing *Anderson*, 477 U.S. at 250-51).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Sawyer*, 243 F. Supp. 2d at 1262 (quoting *Anderson*, 477 U.S. at 251-52); *see also LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

## III.   DISCUSSION

Section 1983 provides a private cause of action against any person who, "under color of" state law, deprives another of "any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. Plaintiff asserts § 1983 claims against the following Defendants: (1) the Correctional Officers and Defendant Sansing in their individual capacities; (2) Defendant Kennedy in his individual capacity; and (3) the Correctional Wardens in their individual capacities (for supervisory liability). (Doc. # 132). Although Defendants have filed four different motions, their arguments are largely the same.[12] All four motions argue that: (1) each Defendant acted within their discretionary authority; (2) Plaintiff cannot establish that Defendants violated Rutledge's Eighth Amendment rights; and, in any event, (3) Plaintiff cannot establish Defendants violated clearly established law. In addition, the Correctional Officers and Kennedy argue that Counts One and Two in the Complaint should be analyzed as an Eighth Amendment claim for deliberate indifference rather than a wrongful death claim.

### A.   The Proper Reading of Plaintiff's Pleadings and Wrongful Death Claims

The parties agree that Plaintiff has standing to bring this action on behalf of the estate of Rutledge. *See* Ala. Code § 6-5-410 and 42 U.S.C. § 1988(a); *see also Est. of Gilliam ex rel. Waldron v. City of Prattville*, 639 F.3d 1041 (11th Cir. 2001). However, the Correctional Officers and Kennedy claim that Plaintiff cannot assert a wrongful death claim and a deliberate indifference claim within the same count.

The Correctional Officers and Kennedy argue that, by asserting a wrongful death claim and an Eighth Amendment claim together, Plaintiff's claims are duplicative. However, it is clear that

---

[12] One exception to the similarity of arguments is this: Sansing contends that Plaintiff cannot establish a cause of action against her under section 1983. (Doc. # 187). In this opinion, the court has limited its analysis to the issue of qualified immunity. To the extent Sansing seeks dismissal for reasons other than her assertion of qualified immunity, her motion is due to be denied without prejudice. These arguments can be raised again at a later time, if appropriate.

Plaintiff is not asserting two separate claims but rather that Defendants' deliberate indifference, which she says violated the Eighth Amendment, led to the wrongful death of Rutledge. The counts contain one claim, not two. *See Waites v. Limestone Correctional Facility*, No. 5:14-CV-02181-CLS, 2017 WL 2797124, at *17 (N.D. Ala. June 27, 2017) (considering Count I, which asserted "a wrongful death claim based upon Ala. Code § 6-5-410 asserted through 42 U.S.C. § 1983 and § 1988(a)…for deliberate indifference," as one claim); *see also Wilson v. Stewart*, No. CV 18-00461-B, 2021 WL 3439398, at *6-7 (S.D. Ala. Aug. 5, 2021) (finding that Plaintiff asserted one claim – a wrongful death claim under section 1983 for deliberate indifference which resulted in the death of the decedent). Therefore, to the extent the Correctional Officers and Kennedy seek to dismiss any claims based on this basis, their motions for summary judgment are due to be denied.

### B.    Qualified Immunity

Qualified immunity shields government officials from liability for civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "The doctrine protects 'all but the plainly incompetent or one who is knowingly violating the federal law.'" *Powell v. Snook*, 25 F.4th 912, 920-21 (11th Cir. 2022) (quoting *Terrell v. Smith*, 668 F.3d 1244, 1250 (11th Cir. 2012)).

To be entitled for qualified immunity, a defendant must first establish that he was acting within his discretionary authority when the alleged misconduct occurred. *See, e.g., Richmond v. Badia*, 47 F.4th 1172, 1179 (11th Cir. 2022). If an officer does so, then "the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Penley v. Eslinger*, 605 F.3d 843, 849 (11th Cir. 2010).

When a plaintiff does not dispute that a defendant was operating within their discretionary authority (as is the case here), "the burden shifts to the plaintiff to show that (1) the [defendants]

24

violated a constitutional right and (2) the right was clearly established at the time of the alleged violation." *Piazza v. Jefferson Cnty.*, 923 F.3d 947, 951 (11th Cir. 2019). "Should the court determine that a plaintiff has not alleged a deprivation of a constitutional right, then the inquiry ends." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5 (1998). However, if the court determines that a plaintiff has alleged a deprivation of a constitutional right, then further inquiry is necessary into "whether that right allegedly implicated was clearly established at the time of the events in question." *Id.* at 841 n.5. "Clearly established" rights must be "developed [] in a concrete factual context so as to make it obvious to a reasonable government actor that his actions violate federal law" established at the time of the purported violation. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). A court has the option to bypass the first element requiring a plaintiff establish a constitutional violation and go straight to the second element, the "clearly established law" inquiry. *See Pearson*, 555 U.S. at 236.

### 1.      Discretionary Authority

'Discretionary authority' includes all acts of a governmental official that are (1) undertaken pursuant to the performance of official duties and (2) within the scope of the official's authority. *Jordan v. Doe*, 38 F.3d 1559, 1566 (11th Cir. 1994). Again, Plaintiff does not dispute that Defendants operated within their discretionary authority. Therefore, the court need not address Defendants' arguments on this issue.

### 2.      Is there sufficient evidence that Rutledge's Eighth Amendment rights were violated by Kennedy, Sansing, and the Correctional Officers

In relevant part, the Eighth Amendment prohibits the "inflict[ion] of cruel and unusual punishment." U.S. Constit. Amend. VIII. It has been made "applicable to the states through the Fourteenth Amendment," and "'set[s] limits on the treatment and conditions that states may impose on prisoners.'" *Ivory v. Warden, Governor of Alabama*, 600 F. App'x 670, 676 (11th Cir. 2015)

(quoting *Hamm v. DeKalb Cnty.*, 774 F.2d 1567, 1571 (11th Cir. 1985)). "The Amendment also imposes duties on these officials, who must provide humane conditions of confinement" along with "adequate food, clothing, shelter, and medical care, and [these officials] must 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S. Ct. 1970, 128 L.Ed.2d. 811 (1994). Although "[t]he Constitution 'does not mandate comfortable prisons,'" it does not permit inhumane ones. *Id.* (quoting *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981)).

As the Eleventh Circuit has explained, "[i]n the prison context, three distinct Eighth Amendment claims are available to plaintiff inmates alleging cruel and unusual punishment, each of which requires a different showing to establish a constitutional violation." *Thomas v. Bryant*, 614 F.3d 1288, 1303-04 (11th Cir. 2010). Those three sets of claims can be categorized this way: those challenging (1) specific conditions of confinement; (2) the excessive use of force; and (3) prison officials' deliberate indifference to a serious medical need. *Id.* at 1303-04. Based on the record, it is readily apparent that Plaintiff challenges the conditions of Rutledge's confinement.

"[T]he conditions of confinement must meet 'the evolving standards of decency that mark the progress of a maturing society.'" *Brooks v. Warden*, 800 F.3d 1295, 1303 (11th Cir. 2015) (quoting *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976)). Accordingly, correctional officials may not expose an inmate to an objectively "unreasonable risk of serious damage to his future health." *Id.* (quoting *Chandler v. Crosby*, 379 F.3d 1278, 1289 (11th Cir. 2004)).

In *Farmer*, the Court made clear that "a prison official violates the Eighth Amendment only when two requirements are met." 511 U.S. at 834. First, the deprivation in question must, "objectively, be sufficiently serious." *Id.* Second, "to violate the Cruel and Unusual Punishment Clause, a prison official must have a 'sufficiently culpable state of mind.'" *Id.* This second requirement means that the prison official must be deliberately indifferent. *Id.* (citations omitted).

Recently, the Eleventh Circuit, sitting en banc, clarified "the standard for establishing liability on an

Eighth Amendment deliberate-indifference claim":

> 1. *First*, of course, the plaintiff must demonstrate, as a threshold matter, that he suffered a deprivation that was, "objectively, 'sufficiently serious.'" [*Farmer*, 511 U.S.] at 834 (citation omitted).

> 2. *Second*, the plaintiff must demonstrate that the defendant acted with "subjective recklessness as used in the criminal law," *id*. at 839, and to do so he must show that the defendant was actually, subjectively aware that his own conduct caused a substantial risk of serious harm to the plaintiff – with the caveat, again, that even if the defendant "actually knew of a substantial risk to inmate health or safety," he "cannot be found liable under the Cruel and Unusual Punishments Clause" if he "responded reasonably to the risk." *Id*. at 844-45, 114 S.Ct. 1970.

*Wade v. McDade*, 106 F.4th 1251, 1261-62 (11th Cir. July 10, 2024) (emphasis in original).

Thus, the court must analyze two elements as it relates to Plaintiff's deliberate-indifference

claim: (1) whether Rutledge's alleged deprivation was objectively, sufficiently serious; and

(2) whether Defendants acted with "subjective recklessness as used in the criminal law." *Id.*

However, a plaintiff will not satisfy the second element if the defendants responded

reasonably to the risk, even if the defendants actually knew of a substantial risk to inmate

health or safety.[13]

Below, the court will address these elements as to each Defendant.

### a.    The First Element – Objectively, Sufficiently Serious Deprivation

Sansing is the only Defendant to challenge whether the heat in the T Unit on December 7,

2020 was sufficiently serious. The *Wade* court did not address this element in its opinion because

---

[13] The *Wade* court was silent on how the causation element of the former standard is affected by the new standard articulated in the decision. *Compare Saunders v. Sheriff of Brevard Cnty.*, 735 F. App'x 559, 564-65 (11th Cir. 2018) *to Wade*, 106 F.4th 1251, 1261-62. Under the *Wade* test, the causation element appears to be subsumed by the former second element (*i.e.,* the defendant's sufficiently culpable state of mind). The court analyzes the test accordingly. However, even if the causation element were evaluated independently, the court's conclusion reached below would not change.

both parties agreed that the plaintiff's condition in that case was sufficiently serious. *Id.* at 1255. Accordingly, the court relies on the Eleventh Circuit's prior case law regarding an "objectively, sufficiently serious" deprivation insofar as it is consistent with the *Wade* decision. *See id.*, 106 F.4th 1251, 1265 (Jordan, J., concurring) (suggesting that, to the extent prior Eleventh Circuit deliberate-indifference cases are not inconsistent with *Wade*, "they should continue to be cited as binding precedent").

The Eleventh Circuit has held that "the Eighth Amendment applies to prisoner claims of inadequate cooling and ventilation." *Chandler*, 379 F.3d at 1295. Of course, "a prisoner's mere discomfort, without more, does not offend the Eighth Amendment." *Id*. As required by the first element, the inadequate cooling and ventilation must "result in the denial of 'the minimal civilized measure of life's necessities.'" *Farmer*, 511 U.S. at 834 (quoting *Rhodes*, 452 U.S. at 347, 101 S. Ct. at 2399). To assess whether an inmate's exposure to heat rises to this level, courts must consider "both the severity and the duration of the prisoner's exposure to inadequate cooling and ventilation." *Groover v. Israel*, 684 F. App'x 782, 786 (11th Cir. 2017) (quoting *Chandler*, 379 F.3d at 1295).

Sansing argues that sufficient remedial measures were present on December 7, 2020, and thus Plaintiff cannot show a sufficiently serious condition existed. Sansing argues that Rutledge had access to cold drinking water from his cell sink, that he could have requested ice at any time, and that inmates were offered daily cold-water showers. Plaintiff, however, disputes that Rutledge had access to these remedial measures. According to Plaintiff, Rutledge had difficulty obtaining cold water from his sink, was unable to choose at will when to shower, and was limited in the amount of ice he could receive from Jenkins due to the logistics of carrying the ice up stairs to each individual cell. And though Rutledge declined the ice provided by Jenkins, this does not diminish the limits on the remedial measures provided the day of the incident. The record makes clear that Rutledge's body temperature shortly after he was pronounced dead was over 109ºF and each cell's temperature was

28

well over 100ºF. A reasonable jury could find that, given the health and safety risks associated with exposure to high temperatures, the remedial measures Sansing points to were insufficient to address the excessive heat on December 7, 2020. *See Groover*, 684 F. App'x at 786. Therefore, Plaintiff has established a genuine issue of material fact as to whether the conditions of Rutledge's confinement were sufficiently serious. Sansing's argument to the contrary is without merit.

### b.       Second Element – Deliberate Indifference

Because the Eighth Amendment is specific as to what officer conduct is prohibited, courts must "ensure that only *inflictions of punishment* carry liability." *Farmer*, 511 U.S. at 839 (emphasis added). Thus, the *Farmer* court – and, in turn, the Eleventh Circuit – focus on the defendant's subjective awareness to determine if a defendant acted with deliberate indifference.

Under the second element, "a prison official must have a 'sufficiently culpable state of mind.' In prison-conditions cases that state of mind is one of 'deliberate indifference' to inmate health or safety." *Farmer*, 511 U.S. at 834 (internal citations omitted). To show deliberate indifference, a plaintiff "must prove that the defendant acted with 'subjective recklessness as used in the criminal law.'" *Wade*, 106 F.4th at 1255. This first requires a showing that the defendant was aware of a risk of harm to the inmate. *Id.* at 1256 (citing *Farmer*, 511 U.S. at 836-37). Then, the "plaintiff must show that the defendant official was subjectively aware that his own conduct – [] his own actions or inactions – put the [inmate] at substantial risk of serious harm." *Id* at 1258. However, "a prison official who acts reasonably cannot be found liable under the Cruel and Unusual Punishments Clause." *Id.* at 1257 (quoting *Farmer*, 511 U.S. at 845) (internal marks omitted).

In cases that stem from the defendant's alleged "inaction" (like this one), the plaintiff challenges a prison official's failure to do something. *Id.* at 1259. And "where the deliberate-indifference claim can be cast in 'inaction' terms, the relevant risk is inextricably tied to the defendants' own conduct." *Id.* at 1260. For example, here, Rutledge's risk does not come from his

mental health diagnosis or the medication he took but rather from his prolonged exposure to elevated temperatures and Defendants' failure to intervene. *See id.*

After careful review of the record, the court concludes that there is a genuine dispute as to whether Defendants acted with deliberate indifference to the risk of harm to Rutledge's health due to overheating in the T Unit.

### i.        Kennedy

Though Kennedy was arguably aware of the risk to Rutledge's health, the record shows that he was unaware that his inaction would put Rutledge at risk of substantial harm. However, Kennedy's motion does not turn on that question. Rather, the court also concludes that Kennedy responded reasonably under the circumstance and, thus, is entitled to qualified immunity.

### Awareness of a Risk of Harm to Rutledge

While there is no dispute that Kennedy was aware of Rutledge's susceptibility to heat-related illness, the parties dispute what knowledge constitutes subjective knowledge of a serious risk of harm in this context. Kennedy argues that, because he was unaware of the excessive heat in Rutledge's cell (and in the T Unit as a whole) on the night of the incident, he "did not know of the underlying facts indicating a sufficiently substantial danger." *Rodriguez v. Sec'y for Dept. of Corr.*, 508 F.3d 611, 617 (11th Cir. 2007). On the other hand, Plaintiff argues that Kennedy had subjective knowledge because he was aware that the heating system was not functioning properly, which necessarily increased the risk of overheating in the T Unit.

"[A] prison official cannot be found liable under the Eighth Amendment…unless the official knows of and disregards an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837. The official must be both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* For Kennedy to have the requisite subjective knowledge, he must have been aware of a substantial risk of the RTU overheating, which

subjected the inmates housed there to a risk of heat-related illness. This awareness must be based on the facts known to Kennedy as of December 7, 2020.

It is undisputed that, as early as December 2, 2020, Kennedy was aware that the PRV was malfunctioning, and that constant monitoring of the heating mechanism while operating on manual control was necessary to avoid overheating in the RTU. Because Kennedy was aware the inmates in the T Unit were susceptible to heat-related illnesses, Kennedy was aware of the risk of serious harm to the inmates in T Unit should the unit become too hot. When viewing the facts in the light most favorable to Plaintiff, a genuine dispute exists as to whether Kennedy had the requisite subjective knowledge.

### Awareness that Inaction Put Rutledge at Substantial Risk of Serious Harm

To satisfy this sub-element, Plaintiff must show that Kennedy knew that his inaction put Rutledge at a substantial risk of serious harm. Even viewing the facts most favorably to Plaintiff, she has failed to establish a genuine issue of material fact as to whether Kennedy was subjectively aware that his inaction put Rutledge at a substantial risk of experiencing hyperthermia.

There is no dispute that the heating mechanism for the T Unit was not fully functional on December 7, 2020. There is also no dispute that Kennedy was responsible for constantly monitoring the heating mechanism to prevent the RTU from overheating. During December 2020, Kennedy monitored and recorded the temperature of the boiler heating water loop twice daily, attempting to keep the temperature between 112°F and 120°F. And, as he had done before, Kennedy went home at the end of his shift, leaving the heating mechanism running on manual controls. Because the heating mechanism was left unattended, Plaintiff contends that there was nothing and no one to prevent the heat from constantly blowing in the T Unit.

The general knowledge Kennedy had regarding the malfunction of the heating mechanism and of the risk to Rutledge's health is not enough to satisfy this element. The record shows that

Kennedy knew that Rutledge and other inmates taking psychotropic medication were susceptible to heat-related illness. The record also shows that Kennedy was aware that the correctional officers conducted (or were supposed to conduct) temperature checks of each cell. Based on the record, Kennedy was entitled to rely on the fact that, even if he were not monitoring the heating mechanism, the correctional officers would identify instances of excessive heat in the T Unit and take appropriate action. Thus, he could not have been aware that his inaction, *i.e.,* not monitoring the heating mechanism overnight, would put Rutledge at a substantial risk of serious harm. Therefore, Plaintiff has not satisfied her burden under this element as to Kennedy.

### Reasonable Response to the Risk

Even if Plaintiff had shown a genuine dispute regarding Kennedy's inaction, the court concludes that Kennedy responded reasonably to the risk to Rutledge's health.

In addition to the reasons indicated above, Plaintiff's allegations do not show how Kennedy's response was unreasonable given the circumstances. Kennedy left his shift after monitoring the heating mechanism the same way he had before. There is no evidence in the record that Kennedy knew of any previous problems with his method of monitoring the heating mechanism nor any previous problems with letting the system run on manual controls overnight. As discussed above, Kennedy had no reason to think that any problem with the heating in the T Unit would go undetected based on the required regular temperature checks conducted by the correctional officers and monitored by cube officers. Thus, it was not unreasonable for Kennedy to leave Donaldson on December 7, 2020 with the heating system on manual controls. At most, Kennedy's conduct shows an "ordinary lack of due care for the prisoner's interests or safety" rather than unreasonable conduct. *Farmer*, 511 U.S. at 835 (quoting *Whitley v. Albers*, 475 U.S. 312, 319, 106 S. Ct. 1078, 1084 (1986)). "[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of

punishment." *Farmer*, 511 U.S. at 838. Therefore, Kennedy is entitled to qualified immunity and his motion is due to be granted.

### ii.  Sansing

Viewing the facts in the light most favorable to Plaintiff, there is a genuine issue of material fact as to whether Sansing had a sufficiently culpable state of mind at the time of Rutledge's death.

### Awareness of a Risk of Harm to Rutledge

A prison official's knowledge of a substantial risk may be inferred from the fact that the risk was obvious. *Farmer*, 511 U.S. at 842. Plaintiff argues that this inference should apply to Sansing. While there is a question as to whether this inference applies to Sansing, the court nonetheless finds that Sansing had subjective knowledge of the risk to Rutledge's health.

There is no dispute that Sansing knew that inmates taking psychotropic medication – including Rutledge – were more susceptible to heat-related illness.  There is also no dispute that the temperature of Rutledge's cell (and those surrounding it in the T Unit) actually measured between 101°F and 104°F right around the time of Rutledge's death. Nurse Kringle and Warden Peters both felt the intensity of the heat as soon as they stepped into Rutledge's cell. However, Plaintiff does not argue, and there is no evidence in the record showing, that the heat felt inside the cells could also be felt in the day room. Thus, because Sansing did not leave the cube office until Jenkins notified her about Rutledge, a reasonable jury could not infer that the risk of injury from the temperature in the T Unit was obvious to Sansing.

But the detection of heat in the cube office or day room is not the only way to show that Sansing had subjective knowledge of the risk of RTU temperatures causing heat-related illness. Before Sansing ever left the cube office on the night of Rutledge's death, Jenkins reported to her that it was hot in the cells and asked for permission to distribute ice to the other inmates. Shortly thereafter, Sansing notified Dean that ice had been distributed, and Dean subsequently offered

inmates the opportunity to shower. Pursuant to the applicable regulations and procedures for the RTU, distributing ice and providing additional showers were methods to manage the risk of heat-related illness. Thus, based on her response to Jenkins's concerns, a reasonable jury could infer that Sansing had subjective knowledge of a risk of serious harm to Rutledge's health based on the T Unit temperature.

### Awareness that Inaction Put Rutledge at Substantial Risk of Serious Harm

The record makes clear that Sansing was subjectively aware that her failure to properly conduct temperature checks put Rutledge at risk of serious harm. Sansing argues that she was unaware that her inaction resembled cruel and unusual punishment by putting Rutledge's health at risk. Specifically, Sansing claims that her conduct was not deliberately indifferent because (1) she was unaware of the heat in Rutledge's cell, (2) she was "trained" to falsify the temperatures of each cell, and (3) Jenkins failed to inform her of how hot it was within the T Unit. The court has already addressed Sansing's first argument above and finds a genuine dispute as to whether Sansing had subjective knowledge of the excessive heat in the T Unit and Rutledge's cell. The Rule 56 record also undermines Sansing's remaining arguments.

There is no dispute that Sansing did not accurately record the temperature of each cell in the T Unit. In fact, Sansing testified that she falsified the recorded temperature of the cells for R, S, T, and U Units in her temperature log. However, Sansing contends that she did so because other correctional officers instructed her to record the day room temperature in place of each individual cell's temperature. Regardless of this so-called training from her colleagues, Sansing understood the importance of monitoring the temperature in the RTU. She was also aware that her responsibilities called her to oversee the duties of the correctional officers, which included monitoring the recorded temperature for the T Unit. Rather than ensuring the T Unit temperatures were properly recorded by the correctional officers, Sansing recorded the day room temperature, which she knew was falsifying

34

the temperature logs. Thus, Sansing's falsified temperature logs bolster Plaintiff's argument that Sansing knew her inaction put Rutledge's health at risk.

And finally, in an attempt to shift fault away from herself, Sansing argues that she was unaware of the excessive heat in the T Unit because Jenkins failed to notify her. This argument ignores one crucial, undisputed fact: Sansing – not Jenkins – was responsible for the T Unit. Even if Jenkins did not complain of *excessive* heat as Sansing argues, he nonetheless notified her that the T Unit was hot. Despite this complaint by Jenkins, Sansing continued to rely on her inaccurate temperature readings rather than instruct the rover officers to accurately record the temperature of each individual cell as was required under ADOC and Donaldson policy. Sansing not only failed to accurately record the temperature of the T Unit cells and failed to check on Jenkins's complaint of heat, but she also attempted to conceal her inaction. Based on her conduct, a reasonable jury could infer that Sansing was aware that her inaction put Rutledge's health at risk. *See Rogers v. Santa Rosa Cnty. Sheriff's Office*, 856 F. App'x 251, 255 (11th Cir. 2021) ("The deputies never physically checked [decedent], and Gaddis falsified records to conceal their inaction. A jury could find…that their failure to perform the task assigned to them constituted deliberate indifference.").

The record shows that Sansing was subjectively aware that, by failing to properly monitor the temperature in the T Unit cells, her inaction placed inmates at risk of experiencing heat-related illness, particularly inmates like Rutledge who took medications that increased the danger of high temperatures. Accordingly, there is a genuine dispute as to whether Sansing acted with deliberate indifference regarding the risk to Rutledge's health.

### Reasonable Response to the Risk

On this record, the court concludes that Sansing failed to respond reasonably to the risk created by her inaction.

Sansing argues that her response to Jenkins's complaint about the heat in T Unit – allowing Jenkins to distribute ice to the other inmates – was reasonable. Sansing also claims that once she became aware of the excessive heat and Rutledge's condition she responded reasonably. Even assuming, *arguendo*, that both of her assertions are true, Sansing only focuses on part of the circumstances leading up to Rutledge's death. Sansing testified that she did not think it was important to know the temperature of each individual cell because she took the temperature of the day room as she was told to do. Sansing also acknowledged that her method of recording temperatures for the RTU led to falsified data. Even if her falsified temperature logs were the result of improper excessive heat training, as she argues, Sansing was nevertheless aware of her responsibilities as the cube officer on shift. And while Sansing did permit the distribution of ice, this does not make up for the other policies and procedures she blatantly ignored. The jury could conclude that if she had adhered to the applicable ARs and SOPs, or at least instructed a rover officer to properly conduct temperature checks, the excessive heat in the T Unit could have been detected and addressed prior to Rutledge's death.

By failing to follow the proper policies and procedures required of the cube officer on shift, Sansing "exposed [Rutledge] to a sufficiently substantial 'risk of serious damage to his future health.'" *Farmer*, 511 U.S. at 843 (citation omitted). Thus, there is a genuine issue of material fact about whether Sansing responded reasonably to the risk to Rutledge's health created by her inaction.

### iii.     Correctional Officers

Based on the Rule 56 record, there is a genuine issue of material fact as to whether the Correctional Officers acted with the sufficiently culpable state of mind on the night of Rutledge's death.

36

**Awareness of a Risk of Harm to Rutledge**

The Correctional Officers argue that none of them had the requisite awareness of the risk of serious harm on the night Rutledge died. Plaintiff argues that the Correctional Officers had subjective knowledge of the risk of RTU temperatures causing heat-related illness because that risk was obvious. *See Farmer*, 511 U.S. at 842.

Like Sansing, the Correctional Officers were aware that inmates taking psychotropic medication were more susceptible to heat-related illness. It is also undisputed that the temperature of Rutledge's cell measured between 101ºF and 104ºF shortly after Rutledge's death. However, there is a dispute as to whether the Correctional Officers were aware of the heat in the T Unit cells.

Nurse Kringle and Warden Peters both felt the intensity of the heat as soon as they stepped into Rutledge's cell. Because all three Correctional Officers were directly in front of Rutledge's cell during their respective shifts, a jury could find that the Correctional Officers would have also felt the heat emanating from Rutledge's cell. Based on this information, a reasonable jury could infer that the Correctional Officers had subjective knowledge of the risk of the T Unit temperature causing harm to Rutledge.

**Awareness that Inaction Put Rutledge at Substantial Risk of Serious Harm**

The Correctional Officers argue that they were unaware that their inaction put Rutledge at a substantial risk of hyperthermia. Specifically, the Correctional Officers argue that "[they] could not have consciously chosen to do nothing about excessive heat [they] did not know about." (Doc. # 213). However, because the court concludes that there is a genuine issue of material fact as to whether they were aware of the heat, this argument falls flat at the summary judgment stage.

The parties do not dispute that the Correctional Officers received training on the relevant ARs and SOPs, which included instruction on temperature checks in the RTU and issues related to

excessive heat. The parties also do not dispute that the Correctional Officers were aware of Rutledge's susceptibility to heat-related illness. Because the Correctional Officers knew of the excessive heat coming from Rutledge's cell (as discussed above), a reasonably jury could find that the Correctional Officers were aware that their inaction put Rutledge at risk of hyperthermia. For example, the Correctional Officers were trained to record the temperature of each cell, contact the wardens or shift commander if the temperatures were extremely elevated (as was the case in Rutledge's cell), and begin remedial measures. Despite the subjective knowledge of the excessive heat, none of the Correctional Officers attempted to alleviate the risk of heat-related illness. Therefore, there is a genuine dispute of material fact as to whether the Correctional Officers were aware that their inaction put Rutledge at risk of heat-related illness.

### Reasonable Response to the Risk

The court concludes that there is at least a question of fact as to whether the Correctional Officers failed to respond reasonably to the risk created by their inaction. Dean and Griffin did execute one remedial method for excessive heat: offering additional showers to the inmates. However, as with Sansing, partial compliance with the applicable ARs and SOPs cannot at this stage of the proceedings be said to have made up for the inaction of the Correctional Officers. Therefore, because they did not comply with the protocols for excessive heat in T Unit, a jury could find the Correctional Officers did not respond reasonably.

### 3.   Is there sufficient evidence that Rutledge's Eighth Amendment rights were violated by the Correctional Wardens

Plaintiff's Eighth Amendment claim against the Correctional Wardens is based on a theory of supervisory liability. (*See* Doc. # 132). "It is well established in this circuit that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability." *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir.

1999) (citation and quotation omitted). However, supervisors may be liable if they personally participated in the allegedly unconstitutional conduct, or if there is a causal connection between the supervisors' actions/inactions and the alleged constitutional deprivation caused by their subordinates. *Patton v. Rowell*, 678 F. App'x 898, 901 (11th Cir. 2017) (quoting *Campbell v. Johnson*, 586 F.3d 835, 840 (11th Cir. 2009)); *Jacoby v. Mack*, 755 F. App'x 888, 905 (11th Cir. 2018). This is an "extremely rigorous" standard. *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003), *abrogated in part on other grounds by Randall v. Scott*, 610 F.3d 701 (11th Cir. 2010).

The Eleventh Circuit has found that "[a] causal connection may be established when: 1) a 'history of widespread abuse' puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he or she fails to do so; 2) a supervisor's custom or policy results in deliberate indifference to constitutional rights; or 3) facts support an inference that the supervisor directed subordinates to act unlawfully or knew that subordinates would act unlawfully and failed to stop them." *Mathews v. Crosby*, 480 F.3d 1265, 1270 (11th Cir. 2007). A causal connection can also be shown if a supervisor failed to train his or her subordinates. *Patton*, 678 F. App'x at 901.

Here, Plaintiff argues that a causal connection can be established (1) under a failure to train theory and (2) by their custom or policy of falsifying temperatures and refusing to act unless the outside temperature is 85°F or higher. The court finds that Plaintiff has failed to establish a causal connection between the Correctional Wardens' action (or inaction) and the alleged constitutional deprivation.

### a. Failure to Train

"[A] supervisor can be held liable for failing to train his or her employees 'only where the failure to train amounts to deliberate indifference to the rights of persons with whom the officers come into contact.'" *Keith v. Dekalb Cnty., Ga.*, 749 F.3d 1034, 1052 (11th Cir. 2014) (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388, 109 S. Ct. 1197, 1204 (1989)). Thus, to succeed on a

39

failure to train claim, a plaintiff must show that the supervisory official had "actual or constructive notice that a particular omission in [their] training program causes [their] employees to violate citizens' constitutional rights, and that armed with that knowledge [they] chose to retain that training program." *Patton*, 678 F. App'x at 901.

The record does not show that either of the Correctional Wardens received such a notice. To show that the Correctional Wardens received notice, Plaintiff must establish "a pattern of similar constitutional violations by untrained employees." *Keith*, 749 F.3d at 1053. According to Plaintiff, a pattern existed because the Correctional Wardens failed to ensure their subordinates understood and implemented their responsibilities as required by the ARs and SOPs for those working in the RTU. However, even viewing the facts in the light most favorable to Plaintiff, there is no evidence in the record of a pattern of constitutional violations during the time the Correctional Wardens held their positions.  In fact, Plaintiff has not pointed to one similar constitutional violation that would put either of the Correctional Wardens on notice that their training methods caused correctional officers to violate the rights of inmates.[14] Without a pattern of similar violations to show that the Correctional Wardens received notice, Plaintiff cannot establish that the Correctional Wardens are liable or a failure to train theory.

### b.      Custom or Policy

Plaintiff also argues that the Correctional Wardens perpetuated two customs or policies that ultimately led to Rutledge's death: (1) falsifying temperature logs and (2) refusing to act unless the outside temperature was 85°F or above. However, the record does not support a finding that the Correctional Wardens maintained either custom or policy.

---

[14] Plaintiff attempts to argue that another inmate died of heat-related illness at Donaldson. However, the record is unclear who this inmate was, whether an inmate died, what caused his alleged death, and what policies and procedures were in place at the relevant time. Accordingly, Plaintiff has not sufficiently established any previous constitutional violations similar to those in this case.

Plaintiff relies heavily on Sansing's deposition testimony to demonstrate that falsifying temperature logs was a custom or policy. Sansing testified that she was "trained" by other cube officers to conduct a temperature check by aiming the temperature gun at the communication tube in the cube office and assigning that temperature to a random cell on the temperature log. But nothing in the record suggests that the Correctional Wardens were aware that temperature logs were falsified or that Sansing was trained in the manner she claims. In fact, nothing in the record suggests that the Correctional Wardens were aware of or involved in other cube officers incorrectly conducting temperature checks or training others to do so. The Correctional Wardens cannot create or approve a custom or policy of which they were wholly unaware.

According to Plaintiff, the Correctional Wardens also had a custom or policy of relying on the outdoor temperature – rather than both indoor *and* outdoor temperatures – to determine when to implement excessive heat protocols. Plaintiff relies on the Correctional Wardens' depositions along with their inaction the day of Rutledge's death to support this claim. Even assuming, *arguendo*, that the Correctional Wardens relied solely on the outdoor temperature when interpreting the applicable regulations and procedures, the RTU correctional officers did not abide by the same interpretation. For example, Dean testified that, if a temperature check *of the cells* read higher than 85ºF, he would contact a supervisor. Rodgers testified that he would notify a supervisor and initiate heat management protocol (*i.e.,* open tray doors, provide additional ice, etc.) if an inmate was exposed to excessive heat – he made no differentiation of whether the exposure was indoors or outdoors. Additionally, the Correctional Officers were all aware that temperature checks necessitated checking temperature of each individual cell. The Correctional Officers were even aware that inmates in the RTU were susceptible to heat-related illness regardless of whether they were exposed to heat indoors or outdoors.

Therefore, viewing the facts in the light most favorable to Plaintiff, the Rule 56 record does not support the conclusion that the Correctional Wardens established any custom or policy that is related to Rutledge's death. Plaintiff cannot show that the Correctional Wardens violated Rutledge's Eighth Amendment right, and the Correctional Wardens are entitled to qualified immunity.[15]

### 4.    Violation of Clearly Established Law

Because the Rule 56 record does not establish that Kennedy and the Correctional Wardens violated Rutledge's constitutional right, the court need not address the "clearly established law" element as it relates to those three Defendants. However, the court must determine whether a reasonable jury could find that Sansing and the Correctional Officers violated clearly established law.

"To be clearly established, a right must be well-established enough 'that every reasonable official would have understood that what he is doing violates that right.'" *Gates v. Khokhar*, 884 F.3d 1290, 1296-97 (11th Cir. 2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). Put another way, "existing precedent must have placed the statutory or constitutional question beyond debate" and thus given defendant officials fair warning that their conduct violated the law. *Id.* "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable [defendant] that his conduct was unlawful in the situation he confronted."

---

[15] In *Wade*, the Eleventh Circuit clarified its precedent for Eighth Amendment deliberate-indifference cases. The Eleventh Circuit articulated an objective and subjective component that plaintiffs alleging deliberate-indifference claims must satisfy. However, the *Wade* court was silent on how, if at all, their holding impacts supervisory liability under the Eighth Amendment. Having said that, the constitutional disposition for the Eighth Amendment requires a defendant to be subjectively aware that their action or inaction would violate the rights of the inmate. The record is clear that the Correctional Wardens did not fail to act or actually act in any way that would violate Rutledge's rights. Thus, even if the court were to analyze Plaintiff's supervisory liability claims under the *Wade* standard, the Correctional Wardens would be further insulated from liability. The *Wade* decision does not make it easier to hold supervisors liable for deliberate indifference, but it is unclear whether the newly articulated standard makes it harder. Both pre-*Wade* and post-*Wade*, the Correctional Wardens are entitled to qualified immunity.

*Saucier v. Katz*, 533 U.S. 194, 202 (2001). There are three ways a right may be clearly established for qualified immunity purposes:

> (1) case law with indistinguishable facts clearly establishing the constitutional right, (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right, or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law.

*Crocker v. Beatty*, 886 F.3d 1132, 1137 (11th Cir. 2018) (citing *Lewis v. City of W. Palm Beach*, 561 F.3d 1288, 1291-92 (11th Cir. 2009)). In the Eleventh Circuit, "only Supreme Court cases, Eleventh Circuit caselaw, and [state] Supreme Court caselaw can 'clearly establish' law." *Thomas ex rel. Thomas v. Roberts*, 323 F.3d 950, 955 (11th Cir. 2003).

The Eleventh Circuit has clearly established that "the Eighth Amendment applies to prisoner claims of inadequate cooling and ventilation" and a correctional officer may be found liable if "the official knows of and disregards an excessive risk to inmate health or safety." *Chandler*, 379 F.3d at 1294-95. Specifically, the Eleventh Circuit clearly established that,

> Although a prisoner or detainee's exposure to hot, uncomfortable temperatures certainly is not *per se* unconstitutional, there is a point where exposure to extreme heat without adequate cooling or ventilation can give rise to a constitutional claim given the health and safety risks associated with exposure to high temperatures.

*Groover*, 684 F. App'x at 786.

Sansing and the Correctional Officers were given fair warning that, by recklessly disregarding the substantial risk associated with prolonged heat exposure for those susceptible to heat-related illness, they would violate Rutledge's constitutional right. Therefore, the law was clearly established at the time of the incident, and the Correctional Officers and Sansing are not entitled to qualified immunity.

IV.   **CONCLUSION**

For the reasons discussed above, the motions for summary judgment are due to be granted in part and denied in part. Because Plaintiff has pointed to sufficient evidence to create a genuine issue of material fact as to whether there was a violation of the Eighth Amendment and whether said violation was clearly established law at the time of Rutledge's death, the Correctional Officers' Motion for Summary Judgment (Doc. # 183) and Kristi Sansing's Motion for Summary Judgment (Doc. # 184) are due to be denied. However, because Kennedy and the Correctional Wardens are entitled to qualified immunity, Billy Kennedy's Motion for Summary Judgment (Doc. # 185) and the Correctional Wardens' Motion for Summary Judgment (Doc. # 181) are due to be granted.

An order consistent with this Memorandum Opinion will be entered.

**DONE** and **ORDERED** this August 15, 2024.

_____

**R. DAVID PROCTOR**
CHIEF U.S. DISTRICT JUDGE

44